1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHELSEA ROBERTS, individually, and
as heir of deceased G.E.D.; CHELSEA
ROBERTS as the parent and legal
guardian on behalf of G.E.D., deceased
minor child; CHELSEA ROBERTS, as the
parent and legal guardian of J.E.D., a
minor, individually and as heir of
MICHAEL DURMEIER,

Plaintiffs,

v.

NYE COUNTY SHERIFF'S OFFICE, a
subdivision of the STATE OF NEVADA;
DEPARTMENT OF PUBLIC SAFETY,
DIVISION OF NEVADA HIGHWAY
PATROL, a political subdivision of the
STATE OF NEVADA; BUREAU OF LAND
MANAGEMENT, a political subdivision of the
STATE OF NEVADA; NYE COUNTY
DEPUTY BREANNA NELSON; BUREAU
OF LAND MANAGEMENT OFFICER
RYAN GALLAGHER; NYE COUNTY
LIEUTENANT ALAN W. SCHRIMPF; NYE
COUNTY DETECTIVE BROOKE GENTRY;
NYE COUNTY DEPUTY MICHAEL
MOKESKI; NYE COUNTY TRAINEE
ISAAC CHAMPLIN; NYE COUNTY
DETECTIVE DANIEL FISCHER; NEVADA
HIGHWAY PATROL TROOPER LUKE
STANG; NYE COUNTY, a County of State of
Nevada; DOE OFFICERS, AGENTS, or the
like I through X, inclusive; and ROE
CORPORATIONS I through X, inclusive,
ROE AGENCIES OR POLITICAL
SUBDIVISIONS I -X,

Defendants.

Case No. 2:22-cv-00398-RFB-EJY

**ORDER**

**and**

**REPORT AND RECOMMENDATION**
Re:  ECF No. 50

Pending before the Court is Plaintiffs' Motion for Leave to File Their Second Proposed
Second Amended Complaint in Accordance with FRCP 15(a) (the "Motion" or "Motion to Amend").

ECF No. 50.  The Court reviewed the Motion, Defendants' Response (ECF No. 51),[1] and Plaintiffs' Reply.  ECF No. 54.

I.      **RELEVANT BACKGROUND**

A.      Procedural Status of the Case.

As the Court prepares this Order, there are four fully briefed Motions to Dismiss pending (ECF Nos. 11, 12, 13, and 15) each of which takes aim at Plaintiffs' Complaint filed in this Court. The Bureau of Land Management also filed a Motion to Dismiss, which Plaintiffs did not oppose. ECF Nos. 43, 44.  Plaintiffs technically have two Motions for Leave to file amended complaints pending, the Motion decided here and a Motion for Leave to File an Amended Complaint (ECF No. 32).

B.      Summary of Facts.[2]

The events giving rise to the instant litigation are tragic.  On March 27, 2021, at around 11:00 a.m., Tyler Kennedy ("Kennedy") awoke in his vehicle, which was parked adjacent to a truck stop and RV park on US 95 in Amargosa Valley, Nevada.  ECF No. 50-1 ¶ 25.  Kennedy proceeded to engage in the use of fentanyl and methamphetamine leading several hours later to a verbal altercation with the owner of the RV park who called 911.  *Id.* ¶¶ 25-29.  The RV park owner reported Kennedy threatened him and asked him for methamphetamine.  *Id.* ¶ 29.  At around 1:41 p.m., Kennedy was approached by Nye County Deputy Breanna Nelson ("Deputy Nelson" or "Nelson") who, over the course of the next forty-five minutes, was joined by at least eight other law enforcement officers from three federal and state agencies.  *Id.* ¶¶ 30-32.

While additional details of the alleged interactions between Kennedy and law enforcement are discussed below, it is undisputed that at approximately 2:25 p.m. Kennedy drove his vehicle onto US 95 heading north, Deputy Nelson followed him for at least 30 minutes, and after Deputy Nelson stopped following Kennedy, Kennedy pulled off the highway, proceeded to smoke fentanyl and/or

---

[1]      The Response to the Motion to Amend, initially filed by Defendant Nye County, was subsequently joined by Defendants Luke Stang, the Nevada Highway Patrol (ECF No. 52), and individual Defendants Breanna Nelson, Ryan Gallagher, Alan W. Schrimpf, Brooke Gentry, Michael Mokeski, Isaac Champlin, and Daniel Fischer (ECF No. 53).

[2]      The Court treats the factual allegations in Plaintiffs' proposed Second Amended Complaint ("SAC") as true. *Sanchez v. Washington*, Case No. 3:21-cv-05915-RJB, 2022 WL 11229086, at *5 (W.D. Wash. Oct. 19, 2022) (when a motion to amend or a motion to dismiss is filed, the court ordinarily credits the factual allegations in the complaint as true).

methamphetamine and then, again, resumed driving.  *Id.* ¶¶ 71, 73, 84-86, 88.  At or near 3:50 p.m., Kennedy crossed the centerline into the lane designated for oncoming traffic in an attempt to pass several vehicles and crashed head on into a vehicle carrying five people: Michael Durmeier ("Durmeier"), his fiancé Lauren Starcevich ("Starcevich"), Starcevich's daughter Emerson, and Durmeier's minor children G.E.D. and J.E.D (collectively the "Victims").  *Id.* ¶¶ 21, 88-90. Starcevich and G.E.D. were killed instantly.  *Id.* ¶ 90.  Durmeier died several minutes after the crash. *Id.*  Emerson survived with serious injuries, and J.E.D. was comatose for several weeks and ultimately suffered brain damage.  *Id.* ¶ 91.  Kennedy sustained minor injuries.  *Id.* ¶ 92.

Plaintiffs assert Defendants' policies, procedures, actions, and inactions led directly to Kennedy's driving while intoxicated and hitting the Victims' car head on in their lane of traffic.  *Id.* ¶ 24.  Defendants' actions forming the focus of Plaintiffs' complaint include:

- Kennedy was assured by law enforcement officers they did not care about his drug use and they would only instigate criminal action if he had "a firearm or 100 pounds of marijuana" in his car.  *Id.* ¶ 34;

- Law enforcement found the remains of fentanyl pills, along with paraphernalia used for smoking fentanyl and/or methamphetamine; however, the officers did not seize Kennedy's supply of drugs or drug paraphernalia.  *Id.* ¶¶ 37-38;

- After determining an alleged gunshot fired by Kennedy was fireworks, the officers present stopped all attempts to investigate or detain Kennedy.  *Id.* ¶ 39;

- Prior to departing the scene and without arresting or detaining Kennedy, Detective Fischer ("Fischer") told Kennedy "We're looking for guns.  If you ain't got a gun, we don't give a shit."  Detective Gentry ("Gentry"), who was standing with Fischer, told Kennedy to "drive safe."  *Id.* ¶ 40;

- Fischer, when speaking with Lieutenant Schrimpf ("Schrimpf"), stated Kennedy was "chasing pills," had "pinpoint" eyes, and was "probably under the influence."  *Id.* ¶ 41;

- In an attempt to avoid mandatory completion of relevant paperwork, Gentry told Nelson she should "[j]ust tell … [Kennedy] not to do drugs."  *Id.* ¶ 42;

- Deputy Nelson told Kennedy "Alright, yeah bro, your pills are going in the trash, alright? Don't do drugs."  *Id.* ¶ 44;

- Following further discussions with Nelson and Schrimpf about Kennedy's drug use in which Kennedy stated "he had to smoke pills or else he'd get sick," Deputy Nelson told Kennedy "Alright, that's your choice."  *Id.* ¶¶ 45-51 (emphasis deleted);

- Schrimpf told Kennedy "You're going to Oregon, so I don't need to trespass you today." *Id.* ¶ 55;

-

- Kennedy responded to the comments from all the officers: "Alright, I'm gonna go in and get what I was coming here for, and then I'll be on my way." *Id.* ¶ 57;

- Deputy Nelson, in parting words to Kennedy, told him "Yeah, your keys are on the front seat of your car." *Id.* ¶ 58; and,

- As Deputy Nelson and Schrimpf walked away from Kennedy, Deputy Nelson stated to Lieutenant Schrimpf, "That was a huge waste of time." *Id.* ¶ 59.

Plaintiffs contend these actions and words demonstrate (1) Defendants' knowledge of Kennedy's intoxicated and agitated state, (2) clear communication to Kennedy that he would not be arrested despite possessing illegal drugs, and (3) their decision to do nothing except to urge Kennedy back on the road and out of their jurisdiction, demonstrating deliberate indifference to Plaintiffs' constitutional rights. *Id.* ¶¶ 38, 45-51, 55-58, 62, 66, 126-128.  Plaintiffs assert Defendants knew the side effects of fentanyl and methamphetamine—agitation and fear—and knew Kennedy was experiencing those effects. *Id.* ¶ 64.  Defendants knew from Kennedy's statements that when he was under the influence of these drugs he was prone to speeding. *Id.* ¶ 65.

Plaintiffs allege even after Kennedy had driven away from the initial encounter with law enforcement, Deputy Nelson followed him for at least 30 minutes, if not an hour, exacerbating Kennedy's fear, agitation, and desire to get out of Nye County (and Nevada generally). *Id.* ¶ 73-76.  Not only had Kennedy already consumed fentanyl and methamphetamine, but he continued to possess illegal drugs he did not want confiscated. *Id.* ¶¶ 77-78.  Kennedy was driving without a valid driver's license, which Deputy Nelson and other law enforcement either knew or, in the course of their interactions with Kennedy, should have known and ignored when they let Kennedy go. *Id.* ¶ 79.  Thus, Kennedy's agitation is alleged to have greatly increased. *Id.* ¶¶ 77-79.  Indeed, as a final act of total indifference to her duty and the safety of others, Plaintiffs allege that while Deputy Nelson followed Kennedy on US 95, she observed Kennedy violating traffic laws and driving erratically but did nothing in response. *Id.* ¶¶ 80-82.  Plaintiffs allege that after Nelson stopped following Kennedy, Kennedy pulled off the road and smoked his remaining supply of fentanyl and methamphetamine. *Id.* ¶¶ 85-86.

Plaintiffs' overarching argument is that but for the actions of Defendants, Kennedy: (1) would have been off the road and not driving at all; (2) would not have been in an increased agitated

state when driving; (3) would not have had access to additional fentanyl and/or methamphetamine; and (4) would not have been driving erratically at high speeds when he got back on the road.  *Id.* ¶ 87.  Plaintiffs contend Defendants encouraged Kennedy to get back on the road and to leave Nye County, which led directly to Kennedy and his vehicle becoming a "mobile hazardous condition" that crashed head on into the Victims.  *Id.* ¶¶ 95-99.  Plaintiffs state there was no legitimate policy objective for Defendants' actions or inactions; rather, it was a desire to reduce their workloads by getting Kennedy out of their jurisdiction that led to Defendants' decisions.  *Id.* ¶¶ 101-02.

With respect to the Nye County Sheriff's Office policies, Plaintiffs focus on Policy 3009, which states: "Individuals under the influence of intoxicating liquor or drugs observed prior to the act of driving a motor vehicle shall, as possible, be prevented from driving."  *Id.* ¶ 107.  Plaintiffs allege then-Nye County Sheriff Sharon Wehrly ("Wehrly" or "Sheriff Wehrly") established "a policy—explicit or implicit—of declining to enforce anti-impaired driving laws against non-resident impaired drivers and of instead encouraging them to pass through their jurisdiction as quickly as possible." *Id.* ¶ 108.  Plaintiffs cite the revocation of a reprimand issued to Nelson, Schrimpf, Gentry, and Fischer, who interacted with and let Kennedy drive off, as evidence of ratification of their conduct by the Sheriff's Office.  *Id.* ¶ 109.  Plaintiffs contend Sheriff Wehrly engaged in a "conscious decision not to even discuss" disciplining these officers for violating Policy 3009 consistent with her "habit of rendering policies and even statutes into dead letters by failing to enforce them."  *Id*. ¶¶ 109-110.

Plaintiffs discuss several additional factors they argue demonstrate Nye County's practices and procedures that led to the instant tragedy.  These include: (1) a lack of appropriate officer training leading to numerous reported incidents of excessive force and other misconduct; (2) the use of "weekend warrior" police officers—some politically connected—who, since they have day jobs, are either unable or unwilling to participate in the necessary time and effort to become fully trained; (3) allowing for such "weekend warriors" to be effectively free from county oversight and discipline; and (4) Sheriff Wehrly's knowledge of a complete lack of policy and procedure enforcement in Nye County.  *Id.* ¶¶ 113-118.  Plaintiffs quote Sheriff Wehrly in support of their allegations that Nye County implemented defective policies and procedures including Sheriff Wehrly recognizing that a

2015 internal audit of the Department found "a very long list of problems." *Id.* ¶ 120. Sheriff Wehrly stated: "Usually that your policies and procedures are bad, and we found out that was true, or your training is bad, and we found out that was true as well, or you just have people who are not doing what the policies and procedures tell them to do." *Id.* ¶ 121.[3]

As a result of the actions and inactions of law enforcement officials who interacted with Kennedy prior to the fatal collision, Plaintiffs assert the following causes of action:

1. Under 42 U.S.C. § 1983, a Violation of Plaintiffs' Fourteenth Amendment Substantive Due Process Rights (*Id.* ¶¶ 125-135);

2. Under 42 U.S.C. § 1983, a Municipal Liability Claim Against Defendants Nye County and Nevada Department of Public Safety (*Id.* ¶¶ 136-143);

3. Negligence and Gross Negligence Against Defendant Officers (*Id.* ¶¶ 144-155);

4. Wrongful Death Against All Defendants (*Id.* ¶¶ 156-163);

5. Negligent Hiring, Training, Retention, and Supervision Against All Defendants (*Id.* ¶¶ 164-170);

6. Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress Against All Defendants (*Id.* ¶¶ 171-176);

7. Under 42 U.S.C. § 1983, a Violation of Plaintiffs' Fourteenth Amendment Substantive Due Process Rights Relating to Interference with Family Relations Against All Defendants (*Id.* ¶¶ 177-185); and,

8. Civil Conspiracy Against All Defendants (*Id.* ¶¶ 186-194).

C.   <u>Plaintiffs' Arguments.</u>

     *1.*   *Defendants Committed Affirmative Acts Resulting in the Head On Collision.*

The Supreme Court decision in *DeShaney v. Winnebago County Department of Social Servs.*, 489 U.S. 189, 195 (1989), and case law from the Ninth Circuit establishes that state actors are not responsible for protecting private citizens from harm caused by other private citizens.[4] There are

---

[3]    Plaintiffs also cite testimony from Nye County Sheriff's Detective Sergeant Morgan Dillon ("Dillon") in which the following exchange took place:
Q: "Well, we could assume that a law enforcement officer with Nye County Sheriff's Office wouldn't let somebody get into a vehicle high or with dope, wouldn't we?" Sergeant Dillon: "I've worked for Nye County for a long time; I don't assume anything." *Id.* ¶ 122.
[4]    *See*, for example, *Johnson v. City of Seattle*, 474 F.3d 634, 639 (9th Cir. 2007).

two exceptions to this general principle: (1) the "special relationship" exception; and (2) the "state-created danger" exception.[5]  Only the second exception is asserted in this case.

In support of their "state-created danger" exception argument, Plaintiffs contend Defendants placed Kennedy in an "agitated state" causing him to become a danger to other motorists on US 95 on the day of the fatal collision.  ECF No. 50 at 4 *citing Mackie v. Cty. of Santa Cruz*, 444 F.Supp.3d 1094, 1105 (N.D. Cal. 2020).  Plaintiffs cite to the guidance established by the Supreme Court requiring Plaintiffs to show that to hold state actors responsible under the state-created danger exception the state actor must put the plaintiff in a "worse position than that in which he would have been had the police not acted at all." *Mackie*, 444 F.Supp.3d at 1104 *citing DeShaney*, 489 U.S. at 201 (brackets removed).  Plaintiffs point to additional cases supporting the proposition that action by law enforcement leaving a third party in an agitated state and more likely to cause harm may render law enforcement liable under the *DeShaney* precedent.  ECF No. 50 at 4.[6]

Plaintiffs' further contend Defendants encouraged Kennedy to continue his drug use (stating variously, they did not care about what drugs he had unless it was 100 pounds of marijuana, it was his "choice" whether to smoke fentanyl, which they knew he had, and jokingly telling him "don't do drugs") and get back on the road (telling him his keys were on his front seat), thereby "emboldening" Kennedy and increasing the risks he posed to Plaintiffs. *Id.* at 4-5.  Plaintiffs cite to *Martinez*, 943 F.3d at 1272, in which a police officer who responded to a domestic violence call told the perpetrator the victim was not "the right girl" for him, which could have "provoked" and "emboldened" the man to further abuse the victim, thereby placing the victim in "greater danger" after the interaction with police.  This conduct, along with additional facts discussed *infra*, supported Plaintiffs' state-created danger claim. *Id. citing Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993), Plaintiffs argue this case bears similarities to the circumstances in *Reed* because Defendants effectively required Kennedy to drive even though he was too intoxicated to do so.  ECF No. 50 at 5.  Indeed, Plaintiffs contend had the police not intervened and required Kennedy to get back on the

---

[5]   *Johnson*, 474 F.3d at 639.

[6]   *Mackie*, 444 F.Supp.3d at 1109-10 (holding a police officer's interactions with a third party and eventual departure without stopping the third party from harming his neighbor was enough to defeat defendants' motion to dismiss); *Martinez v. City of Clovis*, 943 F.3d 1260, 1272 (9th Cir. 2019) (holding a jury could find officer's comment "provoked" third party).

road and drive, he would have "been allowed to sober up in peace" and not been driving under the influence of drugs. *Id*. at 6. Instead of giving Kennedy that chance, Plaintiffs say the officers surrounded his car, scared Kennedy "out of his mind," threatened him with a trespass charge, told him "Nevadans might shoot him," gave him his keys, and tailed him out of the county. *Id*. Plaintiffs say that like the facts in *Reed*, Defendants put an intoxicated driver on the road. *Id*.

### 2. *Plaintiffs Argue the SAC Pleads Facts Sufficient to State a Monell Claim.*

Plaintiffs argue that by pleading facts relating to a specific Nye County policy they state a claim under *Monell v. Department of Social Servs. of New York*, 436 U.S. 658 (1978), and provide Defendants with fair notice and an opportunity to defend themselves. *Id.* at 6-7 *citing Mackie*, 444 F.Supp.3d at 1113. Plaintiffs list factual allegations against Nye County they contend state constitutional violations creating liability under *Monell*. These include: (1) the unwritten but adopted custom, practice, and policy of not enforcing anti-impairment traffic laws (written Policy 3009) against non-Nye County residents and instead encouraging such drivers to pass through Nye County as quickly as possible; and (2) the practice of hiring politically connected and untrained weekend warriors to execute traditional law enforcement duties who are promised they will not be supervised or subject to discipline. *Id.* at 7. Plaintiffs further point to statements made by Sheriff Wehrly and Detective Dillon (*see* n.3) as evidence of a "tone" of constitutional violative behavior in the Sheriff's Office. *Id.* at 7-8 *citing Larez v. City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991).

Plaintiffs further aver that under the *Monell* "ratification" liability theory, their claims are sufficiently pleaded to proceed. *Id.* at 8 *citing Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992). According to Plaintiffs, Sheriff Wehrly has the final say on policy under state law. *Id.*[7] Plaintiffs argue that by rescinding reprimands to officers Nelson, Schrimpf, Gentry, and Fischer, Sheriff Wehrly ratified their behavior underlying this case. *Id.* at 8-9. Upon such ratification, Plaintiffs contend *Monell* liability is triggered. *Id.* at 9.

---

[7]    *Belcher-Bey v. City of Las Vegas*, Case No. 2:12-cv-01829-JAD-CWH, 2014 WL 1153468, at *3 (D. Nev. Mar. 20, 2014).

3. *Plaintiffs Argue the SAC States a Civil Conspiracy Claim Against the Defendants.*

Plaintiffs allege Defendants reached an explicit agreement to force Kennedy to promptly drive north on US 95 out of Nye County the day of the fatal crash. *Id. citing* ECF No. 50-1 ¶¶ 68, 69 (alleging Defendant Officers mimicked scolding Kennedy like a dog when telling Deputy Nelson how to set Kennedy loose, and throwing away Kennedy's drugs so they would not have to file a report). Plaintiffs remind the Court that Nevada law does not require an underlying tort to state a conspiracy. *Id. citing Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1052 (Nev. 2015); *Hotel Riviera v. Short*, 396 P.2d 855, 859-60 (Nev. 1964). Plaintiffs argue their allegations sufficiently demonstrate concerted action by two or more persons with the intent to achieve an unlawful objective will state such a claim. *Id.* Plaintiffs contend the individual officers' interactions with Kennedy were done in conjunction with each other and for their own benefit. *Id.* at 9-10. According to Plaintiffs, the head on car collision was a direct consequence of this conspiracy. *Id.* at 10.

4. *Plaintiffs Argue Neither of the Immunity Doctrines Cited by Defendants Save Them from Liability.*

Plaintiffs dispute the contention that NRS 41.0336—the "public duty doctrine"—shields Defendants from liability here. *Id.* Plaintiffs cite Nevada law imposing a duty "to use due care to make certain that the freeway met the standard of reasonable safety for the traveling public." *Id. citing State v. Webster*, 504 P.2d 1316, 1319 (Nev. 1972). This duty includes the need "to either remedy a known hazardous condition on its highways or give appropriate warning of its presence." *Id. citing State v. Kallio*, 557 P.2d 705, 706 (Nev. 1976). Plaintiffs contend Defendants, who did nothing to warn oncoming motorists of the danger posed by Kennedy, qualify for the "affirmatively caused harm" exception to the public duty doctrine. *Id. citing* NRS 41.0336(2); *State v. Eaton*, 710 P.2d 137 (Nev. 1985) *overruled on other grounds by State ex rel DOT v. Hill*, 963 P.2d 480 (Nev. 1998).

Plaintiffs dismiss Defendants' attempt to use NRS 41.032(2), establishing the "discretionary function immunity doctrine," as a shield against liability. *Id.* at 10-11. Plaintiffs attack Defendants' referenced case law arguing there was no policy objective underlying Defendants' conduct when

interacting with Kennedy or when requiring him to drive impaired. *Id.* at 11 *citing Gonzales v. Las Vegas Metropolitan Police Dep't*, Case No. 2:14-cv-1827-JCM (GWF), 2015 WL 4424552, at *5 (D. Nev. July 20, 2015).  Plaintiffs contend Defendants' actions "are not of the type that Nevada intended to cover in its immunity scheme because they are unrelated to any plausible policy objectives." *Id*. *citing Cepero v. Gillespie*, Case No. 2:11-cv-01421-JAD-NJK, 2020 WL 6173503, at *11 (D. Nev. Oct. 21, 2020) (internal quotation marks and citation omitted).

D.      Defendants' Response.

Defendants aver that Plaintiffs' SAC is futile and, as a result, the Motion to Amend should be denied.  ECF No. 51 at 2.  Defendants argue that as a member of the general public, Plaintiffs' constitutional rights were not violated under any of the theories offered, Defendant Nye County is immune to the instant claims, and Plaintiffs' other claims do not contain the necessary factual allegations to allow them to proceed.  *Id.*

1.      *Defendants Contend Plaintiffs' Due Process Claim Fails as No State-Created Danger Exists under Plaintiffs' SAC.*

Defendants accuse Plaintiffs of citing to isolated and inapplicable case law when arguing their "agitated state" and "encouragement" theories.  *Id.* at 7.  Defendants distinguish the Ninth Circuit decision in *Mackie* by pointing out that Plaintiffs admit Kennedy was already intoxicated prior to his interactions with law enforcement.  *Id.* at 7 n.7.  Defendants state the tortfeasor in *Mackie* was clearly angrier following his confrontation with a police officer than he was before the confrontation, thereby drawing a clear line from the police officer's actions to the eventual harm incurred by the victim.  *Id*. *citing Mackie*, 444 F.Supp.3d at 1105-06.  Defendants claim those facts are not at all like the facts here, and the "agitated state" theory fails as a result.  *Id.*

Defendants next target Plaintiffs' reliance on *Martinez* (*supra* at 7) as support for Plaintiffs' "encouragement theory" of the case.  *Id.* at 7 n.8.  Defendants contend there were no words of "encouragement" by Defendants communicated to Kennedy; rather, Defendants ask the Court to find they tried to convince him to stop his use of narcotics.  *Id*.  Defendants argue the bar to state actor liability remains because the failure to arrest Kennedy "does not … give rise to a state-created danger." *Id. quoting Martinez*, 943 F.3d at 1276-77.

According to Defendants, "placing an unfit driver on the road" theory fails to support Plaintiffs' claims.  *Id.* at 8, n.9.  Defendants take aim at Plaintiffs' reliance on the Seventh Circuit decision in *Reed*.  Defendants state the standard for Due Process Claims is different in the Ninth Circuit than in the Seventh Circuit.  *Id.* n.9 *citing Huffman v. County of Los Angeles*, 147 F.3d 1054, 1061, n.4 (9th Cir. 1998).  Defendants argue that unlike the facts in *Reed,* where officers did not merely let a drunk driver continue to drive, but instead replaced a presumptively sober driver with a known intoxicated passenger, Kennedy was already intoxicated in his car when the officers encountered him.  Therefore, Defendants contend, by allowing Kennedy to drive off, they left the Victims in no worse position than they were already in.  ECF No. 51 at 8, n.9 *citing Reed*, 986 F.2d at 1125, 1126.  As a result, Defendants contend Plaintiffs' "placing an unfit driver on the road" theory also fails.  *Id.*

Defendants reiterate that for the state-created danger exception to apply, and to allow § 1983 claims to proceed against a governmental entity based on the actions of a private party, a plaintiff must allege particularized facts showing Defendants affirmatively created or exposed Plaintiffs to an actual, particularized danger they otherwise would not have faced.  *Id.* at 8 *citing DeShaney*, 489 U.S. at 201; *Martinez*, 943 F.3d at 1271; *Hernandez v. City of San Jose*, 897 F.3d 1125, 1133 (9th Cir. 2018); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006); *Johnson*, 474 F.3d at 639; *Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1086 (9th Cir. 2000).

Defendants also argue that in order to plead a state-created danger claim there must be a special relationship between the governmental actor and the victim or between the perpetrator of the civil rights violation and the victim so as to distinguish the victim from the general public.  *Id.* at 8-9.  According to Defendants, the state-created danger exception does not apply to members of the general public at large.  *Id.* at 9 *citing Steinle v. City & County of San Francisco*, 230 F. Supp. 3d 994, 1023–24 (N.D. Cal. 2017), *aff'd*, 919 F.3d 1154 (9th Cir. 2019) (internal citations omitted). Defendants argue this principle is supported by public policy goals because absent this requirement the state-created danger doctrine would significantly expand subjecting any public safety decision maker to post hoc second guessing.  *Id.*  Distinguishing the facts in this case, Defendants cite a series of circuit and district cases in which they aver there was a direct and personal relationship between

the governmental actor and the eventual victim of a constitutional violation, the dangers involved were particular (not hypothetical) and strongly foreseeable, and the conduct of the state actors was affirmative in nature. *Id.* at 9-10.

Defendants describe the relationship between the law enforcement officers who spoke with Kennedy and the eventual Victims as nonexistent. *Id.* at 10. Further, Defendants argue the danger faced by the Victims was not specific to them. *Id.* Rather, the danger existed to all other members of the public. *Id.* And, along with the unforeseeable nature of the danger, Defendants contend their alleged failure to arrest Kennedy or confiscate his narcotics are not affirmative acts for purposes of the state-created danger exception. *Id.* Defendants argue the risk Kennedy posed to the general public would not have changed irrespective of their interactions. *Id.* at 11. Finally, Defendants dispute the contentions made by Plaintiffs that the failure to take some form of action against Kennedy at the truck stop constituted a state-created danger, pointing to controlling case law. *Id. citing Martinez*, 943 F.3d at 1272.

2. *Defendants Argue Plaintiffs' State Tort Claims Fail Because There Was No Affirmative Harm.*

Defendants aver that under Nevada law and Nevada Supreme Court precedent the "public duty" doctrine shields Defendants from the state law claims made by Plaintiffs. *Id.* at 11-12 *citing* NRS 41.0336; *Scott v. Dept. of Commerce*, 763 P.2d 341, 344 (Nev. 1988) ("when a governmental duty runs to the public, no private cause of action is created by a breach of such duty"). Defendants acknowledge the legal principle—"affirmatively caused harm"—asserted by Plaintiffs as an exception to this general rule, but contend Plaintiffs have not met the pleading standard required to state this exception. *Id.* at 12 *citing* NRS 41.0336. Defendants argue a party seeking to plead an "affirmatively caused harm" claim must show the state actors (1) actively created the situation in which the harm occurs, and (2) the creation of the situation led directly to the harm suffered by the victims. *Id. citing Coty v. Washoe City*, 839 P.2d 97, 99 (Nev. 1992). Defendants point to the Nevada Supreme Court's finding in *Coty* that law enforcement officers were under no statutory duty to arrest a driver even when they determined the driver was legally intoxicated. *Id.* The Nevada Supreme Court held it was the driver who created the danger, not the officer. *Id. citing Coty*, 839

P.2d at 99.  Defendants link this finding to NRS 41.0336, arguing the whole purpose of the law is to shield law enforcement officers from liability for negligent acts or omissions.  *Id.*

Likewise, Defendants argue there was no law enforcement duty to arrest or detain Kennedy and, even if there was negligence in how the officers conducted themselves, the public duty doctrine serves as a legislative wall against state law claims for such action.  *Id.* at 13.  Regarding Plaintiffs' assertions that an affirmative harm was created by law enforcement, Defendants reiterate that Kennedy was driving while under the influence of drugs before and after his encounter with Defendants.  *Id.*  Nothing Defendants did added or subtracted from the danger posed by Kennedy to Plaintiffs or other motorists on US 95.  *Id.*

> 3. *Defendants Argue Plaintiffs' State Law Claims Fail Because Discretionary Immunity Applies to the Facts Alleged in the SAC.*

Defendants cite NRS 41.032(2) arguing this statute bars Plaintiffs' claims.  *Id.* at 14.  Citing to Nevada case law, Defendants argue the purpose of the statute, which codifies the discretionary function immunity doctrine, is to prevent the judicial questioning of "legislative and administrative decisions grounded in social, economic, and political policy through medium of an action in tort." *Id. citing Martinez v. Maruszczak*, 168 P.3d 720, 729-30 (Nev. 2007) (internal citation omitted). Defendants argue under this doctrine courts cannot second guess the officer Defendants' actions because there is no Nevada law making it mandatory for law enforcement to "arrest an intoxicated driver, to conduct drug tests, or to search for and confiscate drugs, even in the presence of probable cause."  *Id.*  Defendants tell the Court not to violate the separation of powers "by deciding questions consigned to the legislative branch."  *Id.*  Defendants focus on preventing potential government overreach as the key policy objective achieved through the legislative decision to leave the determination whether to arrest someone in the hands of law enforcement.  *Id.* at 15-16.  In the instant case, Defendants argue deciding whether to arrest Kennedy, conduct a field sobriety test, or confiscate drugs was solely law enforcement's discretion and their actions are protected from tort liability under NRS 41.032(2).  *Id.* at 15.

4.   *Defendants Argue Plaintiffs' Claim of Civil Conspiracy Fails to Meet the Requisite Pleading Standard.*

Defendants contend none of the facts alleged in the SAC demonstrate a civil conspiracy, a claim which must allege two prongs: (1) two or more persons acting in concert intending to accomplish an unlawful objective for the purpose of harming the plaintiff; and (2) the plaintiff sustained damages as a result of that action.  *Id.* at 16 *citing Sutherland v. Gross*, 772 P.2d 1287, 1290 (Nev. 1989) (internal citation omitted).  Defendants contend Plaintiffs' conspiracy claim is fraud based, which triggers a heightened pleading standard under Nev. R. Civ. P. 9(b).  *Id.* at 16-17.

The party alleging civil conspiracy must include detailed descriptions of the time, place, and identities of the parties involved in the conspiracy.  *Id.* at 17 *citing Brown v. Kellar*, 636 P.2d 874, (Nev. 1981).  Defendants argue Plaintiffs fail to include the identities of the individuals who entered into a conspiracy, the time and place where the conspiracy was formulated, or the unlawful objective sought to be achieved by the conspirators.  *Id.*

According to Defendants, neither the "Impaired Driver Conspiracy" nor the "Concealment Conspiracy" asserted by Plaintiffs holds up against any level of scrutiny, heightened or not.  *Id.* Defendants contend Plaintiffs have not alleged any agreement among law enforcement officers present at the scene with Kennedy or any presence of an unlawful objective with the purpose of harming the Victims.  *Id.*  This defeats the Impaired Driver Conspiracy.  *Id.*  The Concealment Conspiracy theory fails because Plaintiffs have not linked any damages suffered by Plaintiffs to the purported destruction of body camera footage and drug evidence by members of law enforcement. *Id.* at 17-18.

E.    Plaintiffs' Reply.

Plaintiffs reiterate their argument that this was no mere failure to arrest on the part of Defendants.  ECF No. 54 at 2.  Plaintiffs state Defendants were responsible for requiring Kennedy to get back on the road and in the crosshairs of all motorists on US 95, including the Victims.  *Id.* Regarding Defendants' arguments that there was no special relationship, Plaintiffs point out that this conflates the two exceptions to the *DeShaney* holding; that is: (1) special relationship, and (2) state-created danger.  *Id.*  Plaintiffs point out no special relationship is needed for the state-created danger

exception to apply.  *Id.*  Plaintiffs counter that the foreseeability that the Victims would be hurt, not the interactions preceding the head on collision, defines the scope of the state-created danger exception.  *Id.*  Plaintiffs argue it is the "actual" and "particularized" danger, not the identity of victims, that is required to state a claim.  Plaintiffs counter Defendants' arguments focusing on no duty to arrest Kennedy as irrelevant because it was Defendants' affirmative steps that created the danger.  *Id.* at 3.  Plaintiffs argue the fact that Kennedy was already dangerous is false and irrelevant.  *Id.*  Kennedy sitting alone in his car was not dangerous.  *Id.*  Plaintiffs say "[t]hat plaintiff *was* already in danger from a third party does not obviate a state-created danger" if "state actors enhanced the risk."  *Martinez*, 943 F.3d at 1272.  Plaintiffs also rebut Defendants' "actual" and "particularized" argument stating these requirements pertain to whether the officers created a specific danger not the identity of the victims.  *Id.* at 5.

Arguing Ninth Circuit law is trending toward the Seventh Circuit standard, Plaintiffs state some dangers are so evident and some victims so random that state actors can be held accountable by any injured party.  *Id. citing Reed*, 986 F.2d at 1127.  Citing *Hunters Capital LLC v. City of Seattle*, 499 F.Supp.3d 888, 902 (W.D. Wash. 2020), Plaintiffs argue when Deputy Nelson stopped following Kennedy as late as 3:25 p.m., after observing his erratic driving that included crossing the center line of the highway, and given the head on collision occurred at 3:50 p.m., there is clear evidence that Kennedy posed an immediate threat of harm to a defined group of people that had a "limited range and duration."  *Id.* at 7.

Regarding Plaintiffs' civil conspiracy claim, Plaintiffs dispatch with Defendants' arguments regarding spoliation of evidence because they no longer pursue this claim.  *Id.* at 7.  Plaintiffs are asserting a theory that Defendants conspired to place an impaired driver on the road in order to avoid paperwork.  Plaintiffs dispute Defendants' assertion that Nevada law controls the pleading standard for its conspiracy claims.  *Id.*  Plaintiffs contend there is no heightened pleading standard for civil conspiracy not based on fraud.  *Id. citing Chocolate Magic Las Vegas LLC v. Ford*, 337 F. Supp. 3d 950, 960 (D. Nev. 2018).  In fact, Plaintiffs contend that since this is a case involving alleged § 1983 violations by law enforcement officers, facts merely "suggestive" of an agreement to engage in "illegal conduct" suffices to state their claim.  *Id citing Park v. Thompson*, 851 F.3d 910, 928 (9th

Cir. 2017).   Plaintiffs assert they pleaded circumstances necessary to state the presence of a conspiracy to unleash Kennedy onto the roadway. *Id.* at 8.  Plaintiffs counter Defendants' contention that the conspirators must intend harm to the Victims citing Nevada law requiring only that the "natural and necessary consequence" of the conspiracy be "the prejudice of the public or the oppression of individuals." *Id. citing Hotel Riviera*, 396 P.2d at 859-60.

## II.   DISCUSSION

### A.   Leave to File an Amended Complaint.

Under Fed. R. Civ. P. 15(a)(2) courts allow parties great discretion in amending their pleadings. *Allen v. City of Beverly Hills*, 911 F.2d 367, 373 (9th Cir. 1990) (internal quotation marks omitted).   Courts generally evaluate whether the requested leave to amend meets the standard established, which requires drawing all reasonable inferences in favor of granting motions to amend. *Griggs v. Pace American Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) (internal citation omitted). In the Ninth Circuit, Rule 15(a)(2) is applied with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (per curiam).   Federal Rules, not state rules or laws, govern the adequacy of pleadings in federal court. *Bureerong v Uvawas*, 922 F.Supp. 1450, 1480 (C.D. Cal. 1996) (citation omitted).   Nonetheless, it is within the district court's discretion to determine whether to grant leave to amend. *Chappel v. Laboratory Corp. of America*, 232 F.3d 719, 725 (9th Cir. 2000).

Factors considered by the courts when determining whether to grant leave to amend include whether the: (1) moving party acted in bad faith; (2) moving party unduly delayed the request; (3) opposing party will suffer prejudice; (4) amendment is futile; and (5) plaintiff has previously amended its complaint. *Eminence Capital, LLC*, 316 F.3d at 1052.  Courts exercising discretion to grant or deny a motion to amend "must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *U.S. v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981) (internal citation omitted).  Here, Defendants only argue futility and failure to state a claim.

A cause of action is futile only if there is no set of facts can be proved that would constitute a valid and sufficient claim. *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1998).  While

futility alone can justify denying a motion for leave to amend (*Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004)), "denial on this ground is rare and courts generally defer consideration of challenges to the merits of a proposed amended pleading until after leave to amend is granted and the amended pleading is filed." *Cates v. Stroud*, Case No. 2:17-cv-01080-GMN-PAL, 2017 WL 11429893, at *2 (D. Nev. Oct. 26, 2017) (internal citations omitted).

B.  <u>Plaintiffs Assert Sufficient Facts to State § 1983 Claims.</u>

The Civil Rights Statute at 42 U.S.C. § 1983 states that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...."  Plaintiffs contend Defendants deprived them and their family members rights guaranteed by the Due Process Clause of the Fourteenth Amendment.  ECF No. 50-1 ¶¶ 125-135.  The "Due Process Clause of the Fourteenth Amendment was intended to prevent government from abusing its power, or employing it as an instrument of oppression." *DeShaney*, 489 U.S. at 196 (internal citation, brackets, and quote marks omitted).

"There are two exceptions to the general rule that a State's failure to protect an individual against private violence … does not constitute a violation of the Due Process Clause." *Huffman*, 147 F.3d at 1059 (internal citation and quote marks omitted).  Plaintiffs advance the state-created danger exception.  State officials may be held "liable for private violence … where the state affirmatively places the plaintiff in a dangerous situation." *Id. citing L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992); *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989) *cert. denied*, 498 U.S. 938 (1990).  In a § 1983 case, it is the plaintiff's burden to "show that the state official participated in creating a dangerous situation, and acted with deliberate indifference to the known or obvious danger." *Id. citing L.W. v. Grubbs*, 92 F.3d 894 (9th Cir. 1996).  The Ninth Circuit holds that the danger experienced by a plaintiff asserting the state-created danger exception must be "actual" and "particularized." *Martinez*, 943 F.3d at 1271 (internal citation omitted).  A court must ask "whether the officers left the person in a situation that was more dangerous than the one in which they found"

him.  *Id.* (internal citation omitted).  The pre-existing presence of the danger is irrelevant to the court's analysis.  *Id.* at 1271-72.

A plaintiff must also demonstrate that under the circumstances the "ultimate injury" suffered must be "foreseeable."  *Id.* at 1273-74 *citing Hernandez*, 897 F.3d at 1133.  And, a plaintiff must show that the defendants acted "with deliberate indifference to a known or obvious danger."  *Id.* at 1274 *citing Hernandez*, 897 F.3d at 1133 (other citation and internal quotation marks omitted).  This is a high bar as the standard requires a plaintiff to demonstrate the defendant had a "culpable mental state."  *Id.* (internal citation omitted).  "[T]he state actor must have known something was going to happen, but ignored the risk and exposed the [plaintiff] to it anyway."  *Id.* (internal citations and quotation marks omitted).  Whether a risk to the general public is sufficient is unsettled in the Ninth Circuit.  *Huffman*, 147 F.3d at 1061 n.4 ("Because the [plaintiffs'] claim would fail regardless of whether the danger-creation theory extended to threats to the general public, we leave resolution of this question for another day.")

In *Moritz v. Andrews*, several Winnemucca Police Department officers pulled over a vehicle that was allegedly involved in a recent drive by shooting.  Case No. 3:08-cv-519-RCJ-VPC, 2010 WL 769355, at *1 (D. Nev. Mar. 3, 2010).  After stopping the vehicle, the officers determined there was at least one firearm in the car.  *Id.*  The officers were also aware of the "delinquent and dangerous" nature of the vehicle's two occupants.  *Id.* (internal citation omitted).  However, the police officers did not detain the vehicle or the occupants; nor did they confiscate the firearm.  *Id.*  Instead, the plaintiffs alleged the officers allowed the vehicle to remain on the roadways thus putting members of the general public in danger.  *Id.*  After their encounter with police ended, the occupants of the car engaged in another shooting resulting in a man's death.  *Id.*  The man's family filed claims under § 1983 against the City of Winnemucca, the Winnemucca Police Department, and several individual defendants asserting the "state-created danger" exception.  *Id.*

The court held the plaintiffs failed to state a claim.  *Id.* at *5.  The court focused on the Ninth Circuit's guidance requiring examination of whether (1) "the officer left the person in a situation that was more dangerous than the one in which they found him," and (2) affirmative actions taken by the officers exposed the plaintiff to a danger they would not have otherwise faced.  *Id. citing City*

*of Ridgefield*, 439 F.3d at 1062-63.  The court disagreed with the plaintiffs' claim that the officer's failure to arrest or detain the vehicle's occupants, along with the failure to remove the firearm from the vehicle, was state-created danger.  *Id*.  The court also disagreed with the plaintiffs who asserted the failure to remove the firearm made the eventual shooting and killing of another person foreseeable.  *Id*.  The court held the officers' failure to confiscate the firearm did not place the shooting victim in a position of danger "which he would not have otherwise faced."  *Id. citing DeShaney*, 489 U.S. at 197.  Absent that showing, the court found there was no constitutional violation alleged by the plaintiffs, mooting any potential liability on the part of the municipal defendants.  *Id.* at *6.

Here, Plaintiffs state they were exposed to a danger they would not have otherwise faced when Defendants showed substantial force, agitated Kennedy, ignored his intoxication and possession of illegal narcotics they knew he intended to use again, and required him to drive out of Nye County in order to avoid paperwork.  Plaintiffs further allege Deputy Nelson followed Kennedy for at least 30 minutes observing him crossing the center line of the highway—the exact event leading to the head on collision underlying this case—but chose to do nothing in response because she and her co-Nye County law enforcement officers just wanted Kennedy out of their jurisdiction. Knowing Kennedy had a propensity to speed when driving high on fentanyl and methamphetamines, knowing he intended to use these drugs again to avoid getting sick, and knowing Kennedy could seriously injure or kill someone based on erratic and high speed driving, the Officers chose to do nothing demonstrating deliberate indifference to the specific foreseeable danger Kennedy posed to other drivers.  These facts support a plausible claim that when Defendants Nelson, Fischer, Gentry, and Schrimpf (sometimes, collectively, "the Potentially Liable Officers" or the "Officers") acted and failed to act, given the totality of the information they had and observed, their deliberate failure to do their duty led directly to a foreseeable crash resulting injuries.[8]

---

[8]  Regarding Officers Mokeski, Champlin, and Trooper Stang, the Court finds Plaintiffs fail to allege sufficient facts to state a § 1983 claim.  The allegations do not demonstrate these three officers increased danger or that they were deliberately indifferent to the danger posed by Kennedy.  The single allegation made concerning Trooper Stang, that he, along with Deputy Nelson, did not care about any illegal drugs in his possession unless it was 100 pounds of marijuana, is insufficient to state a § 1983 claim.  Further, there are no specific allegations regarding Mokeski or Champlin.  For these reasons, the Court recommends dismissing Plaintiffs' § 1983 claims against Mokeski, Champlin, and Stang.

In *Hunters Capital*, the court considered a motion to dismiss a series of § 1983 claims filed by a class of individuals. 499 F.Supp. 3d at 893. Underlying the claim were facts demonstrating that in the summer of 2020, during civil rights protests following the death of George Floyd, a 16-block section of Seattle became known as the Capitol Hill Occupying Protest ("CHOP"), an area with no official law enforcement presence and barriers separating it from the rest of the city. *Id.* Following several weeks of events that took place within the CHOP zone, plaintiffs filed a class action against the City of Seattle alleging a Section 1983 substantive due process and other constitutional violations under *Monell*. *Id.* at 900-904. With respect to substantive due process, the district court found the actions—policies adopted specific to the event that resulted in the failure to act—were sufficient to state the due process claim. *Id.* at 902. Specifically, the court found plaintiffs' allegations were "sufficient to state a substantive due process claim under the state-created danger exception. Plaintiffs plausibly alleged that the City's actions—encouraging CHOP participants to wall off the area and agreeing to a 'no response' zone within and near CHOP's borders—foreseeably placed plaintiffs in a worse position than they would have been in absent any City intervention whatsoever. Their allegations were also sufficient to show that the City acted with deliberate indifference to that danger." *Id.* (citation omitted). This was true even though the plaintiffs pleaded no direct relationship between the plaintiffs alleging constitutional violations and the accused state actors. *Id.* at 901-03.

> 1. *Qualified Immunity Does Not Bar Plaintiffs' Claims Against Officers Nelson, Fischer, and Gentry, and Lieutenant Schrimpf.*

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Reese v. City of Sacramento*, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231(2009)). In evaluating whether an officer is entitled to this immunity courts consider whether (1) facts a plaintiff alleges are sufficient to establish a violation of a constitutional right, and (2) the right was clearly established at the time of the incident. *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010), *citing Pearson*, 555 U.S. at 223. Qualified immunity bars a claim where there was no constitutional violation or where

the constitutional violation was not clearly established. *Id.* Courts have the authority to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. It is Plaintiffs' burden to satisfy both elements necessary to defeat a qualified immunity claim. *Miller v. County of Nye*, Case No. 21-16826, 2022 WL 16570782, at *1 (9th Cir. 2022).

The Court considers whether "in the light of pre-existing law the unlawfulness" was apparent. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The plaintiff need not identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Controlling precedent weighs heavily in favor of granting qualified immunity to state actors in ambiguous situations. *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003). Applied here, the issue is whether a reasonable official would understand his or her actions and failures to act violated the state-created danger exception to the general proposition that state actors are not responsible for protecting private citizens from harm caused by other private citizens.

There is no dispute that Nelson, Fischer, Gentry, and Schrimpf spoke and interacted with Kennedy for approximately forty-five minutes. ECF No. 50-1 ¶ 32. Plaintiffs allege these four knew as a result of the search of Kennedy's car that he had methamphetamine and fentanyl in his possession (*id.* ¶¶ 37-38), was looking for more illegal drugs (*id.* ¶¶ 48-51), was intoxicated (*id.* ¶ 41), and was displaying signs of paranoia and agitation (*id.* ¶ 35). There is also no dispute that Nelson told Kennedy the Officers did not care about drugs in his car unless it was 100 pounds of marijuana. *Id.* ¶ 34. There is no dispute Fischer thought Kennedy was chasing drugs and already impaired. *Id.* ¶¶ 41-42. There is no dispute Nelson and Schrimpf knew that Kennedy—intoxicated and still in the possession of powerful narcotics with the intent to use them again—planned to drive north on US 95. *Id.* ¶¶ 57-58. There is no dispute that Nelson (1) told Kennedy it was his choice whether to do more drugs, (2) his keys were on the front seat of his car, and (3) followed Kennedy on US 95 heading north out of Nye County for at least 30 minutes. Finally, Plaintiffs allege that together with all this knowledge, Nelson observed Kennedy speeding and driving erratically,

including crossing the center line of traffic—clear violations of Nevada law—choosing to do nothing.

As alleged by Plaintiffs, when Deputy Nelson followed Kennedy as he sped and drove erratically on US 95 north until he approached the Nye county line, knowing Kennedy was intoxicated when she (and other officers) allowed him to get back into his car in which he had illegal drugs he intended to use, and Nelson did nothing despite all her knowledge, Nelson participated in creating a dangerous situation for a known group of persons—others driving on US 95 in reasonable proximity to Kennedy.  Nelson's decisions to do nothing, like the "no response" approach law enforcement took in *Hunter Capital*, is sufficient to state a § 1983, substantive due process claim under the state-created danger exception as Nelson's conduct is also sufficient to plead deliberate indifference.

While Defendants argue the danger Kennedy represented was already present, the Court disagrees for purposes of determining whether Plaintiffs' § 1983 substantive due process claim is barred by qualified immunity at the pleading stage of proceedings.  By effectively requiring (not merely allowing) Kennedy to resume driving north on US 95 to get him out of Nye County, and following Kennedy for a significant amount of time, Deputy Nelson effectively directed an intoxicated driver onto a highway knowing he was sufficiently impaired to cross the center line of traffic, which he did approximately 25 minutes after she ceased following him, resulting in extraordinary harm.  Nelson knew Kennedy posed an immediate threat to other motorists on US 95 and even witnessed him commit traffic violations that could result in catastrophic injuries or death.  A reasonable officer would know that she acted with deliberate indifference to a known and obvious danger that she encouraged and exacerbated through her actions and inactions.

Further, the Ninth Circuit first recognized the theory of state-created danger liability more than 30 years before the events in this case.  *Wood*, 872 F.2d 583.  The Ninth Circuit has since published numerous cases explicitly recognizing such liability under various factual scenarios.  The responsibility for keeping abreast of constitutional developments rests "squarely on the shoulders of law enforcement officials.  Given the power of such officials over our liberty, and sometimes over our lives, this placement of responsibility is entirely proper." *Wood*, 879 F.2d at 595 (quoting *Ward*

*v. County of San Diego*, 791 F.2d 1329, 1332 (9th Cir. 1986)).  Under the facts and circumstances alleged, the Court finds no reasonable officer in Nelson's position, knowing all she knew, would conclude her alleged purposeful inaction was other than participation in creating a specific, foreseeable, dangerous situation for a limited class of people (those driving on US 95 in proximity to Kennedy).  The Court finds Plaintiffs plead sufficient facts to state a claim against Deputy Nelson under § 1983, and qualified immunity does not, at this stage of the litigation, shield her from Plaintiffs claim.

With respect to Schrimpf, Fischer, and Gentry, while they were present and participated in the interactions with Kennedy, and acted in a manner that is at best questionable, it is a closer call whether Plaintiffs have alleged sufficient facts to demonstrate a § 1983 claim under controlling law. Nonetheless, the facts and findings in *Martinez*, 943 F.3d at 1270-74, provide guidance for the Court.

The facts underlying the *Martinez* decision involved two domestic violence calls.  *Id.* at 1266-69.  The domestic violence victim alleged § 1983 violations against two cities and six individual police officers emanating from the lack of action during responses to the two incidents. *Id.* at 1266.  During the first police response, the lead investigating officer ("Officer 1"), who had relevant law enforcement domestic violence experience, did not arrest the perpetrator despite viewing the victim who showed signs of abuse.  *Id.* at 1266-67.  Officer 1 failed to advise the victim of her legal rights or provide her with any information about public support for victims of domestic violence.  *Id.* at 1267.  Officer 1 also spoke to the perpetrator telling him, among other things, that Officer 1 "didn't think that … [the victim was] a good fit for [the perpetrator] …."  *Id.*  Following the departure of the responding officers, the perpetrator physically abused the victim.  *Id.*  During the second incident, another officer ("Officer 2"), who also had training in responding to domestic violence, arrived at the victim's home.  *Id.* at 1268.  Officer 2 believed there was probable cause to arrest the perpetrator, but she was overruled by a superior police officer (the "Sergeant") who ordered that the perpetrator not be arrested.  *Id.*  The Sergeant stated that the perpetrator's family was "good people."  *Id.* at 1269.  After the responding officers left the scene, the perpetrator again physically abused and sexually assaulted the victim.  *Id.*

The Ninth Circuit held Officer 1 did not make the situation worse for the victim when the officer failed to provide the victim with any resources to aid her in her domestic violence struggles. *Id.* at 1272. This inaction alone was not enough for the victim to state a § 1983 claim against Officer 1. *Id.* However, the court held a reasonable jury could find Officer 1's statements to the perpetrator that the victim was not "a good fit" for him was sufficient to plead a state-created danger and, thus, a § 1983 violation. *Id.* In contrast, the Court found no affirmative act by Officer 2 because she did not make any statement to the perpetrator on which a reasonable jury could rely to find the officer placed the victim in greater danger. *Id.* at 1272-73.

With respect to the Sergeant, the Ninth Circuit found he did more than failing to arrest the perpetrator; that is, the Sergeant made positive statements about the perpetrator's family and instructed the perpetrator not be arrested within the perpetrator's earshot ("We're not going to arrest him. We're just going to turn him over to … [another police department]." *Id.* at 1273. Based on this conduct, the court held a reasonable jury could find the Sergeant placed the victim in greater danger than she was before his interactions as the Sergeant's words may have "emboldened" the perpetrator to continue his abusive behavior "with impunity." *Id.* The Ninth Circuit found, in addition to Officer 1 and the Sergeant affirmatively exposing the victim to an actual and particularized foreseeable danger, they also displayed deliberate indifference to the danger posed by the perpetrator when they made their remarks both to and within his earshot. *Id.* at 1274.

In the case at bar, while the type of behavior may be distinguished, the conduct of Schrimpf, Fischer, and Gentry is similar to those of Officer 1 and the Sergeant in *Martinez*. Schrimpf was the most senior Nye County officer at the scene. ECF No. 50-1 ¶ 32. He was aware of Kennedy's intoxication and intent to become more impaired. *Id.* ¶ 41. He explicitly told Kennedy he could continue consuming drugs if that was his wish. *Id.* ¶ 51. Schrimpf informed Kennedy about another person who had allegedly pointed a fake gun at someone and ended up dead. *Id.* ¶ 53. And Schrimpf stated there was no need to arrest Kennedy on that day because he was headed to Oregon into the jurisdiction of someone or some county other than law enforcement in Nye County. *Id.* ¶ 55. Schrimpf was side by side with Nelson while she made her various statements to Kennedy prior to allowing him to drive away. *Id.* ¶ 43. Like the Sergeant in *Martinez*, Schrimpf's knowledge of the

danger posed by Kennedy coupled with his words of affirmation could be interpreted by a reasonable jury to have emboldened Kennedy to continue his dangerous activities. Thus, these facts are sufficient to state a § 1983 substantive due process claim against Schrimpf. A reasonable jury could find Schrimpf placed the Victims in greater danger than they would have been and that he displayed deliberate indifference to the danger posed by Kennedy.

Officers Fischer and Gentry, while jointly speaking with Kennedy, told him they did not care about anything other than potential firearms in Kennedy's possession and they wished him a safe drive. *Id.* ¶ 40. Fischer reported back to Schrimpf that Kennedy was likely impaired with pinpoint eyes. *Id.* ¶ 41. Gentry suggested to Nelson she refrain from taking any official action against Kennedy except encouraging him not to do drugs as this would alleviate paperwork duties she might otherwise incur should the Officers take further steps to prevent Kennedy from driving out of Nye County. *Id.* ¶ 42. Fischer and Gentry's cavalier words and attitude, like those of Officer 1 in *Martinez*, could be interpreted as calming words that allowed Kennedy to believe he would face no consequence should he continue consuming dangerous narcotics while driving.[9] Fischer and Gentry knew or believed Kennedy was under the influence, yet they wanted him to continue on his journey in a car in which illegal drugs remained, which he said he intended to use to avoid becoming ill.

As pleaded, Schrimpf, Fischer, and Gentry did not simply let an intoxicated driver continue driving, they required a known intoxicated driver, who had used powerful illegal narcotics, and who the officers had agitated "through their formidable show of force," to get back on the road after he stated he intended to use the drugs in his possession again. *Id.* ¶¶ 35, 40-42, 46-51, 56. The SAC pleads the Officers allowed these events to unfold without giving a thought to the foreseeable danger they created through their no response approach to Kennedy.[10] There is no reasonable argument,

---

[9]    Although Kennedy is alleged to have stated concern he would again be pulled over (ECF No. 50-1 ¶ 76), Plaintiffs allege the Officers emboldened Kennedy "by choosing not to confiscate illicit drugs from a known drug addict and instructing him to drive away…." *Id.* ¶ 128(b). This decision, along with other actions, statements, and failures may be reasonably interpreted as encouraging Kennedy to continue his illegal conduct (drug use and erratic driving) representing deliberate indifference to foreseeable harm to an identifiable group of people.

[10]    It cannot be reasonably argued that law enforcement is unaware of the danger intoxicated driving presents to other drivers on the road. *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451 (1990) ("No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it. Media reports of alcohol-related death and mutilation on the Nation's roads are legion. The anecdotal is confirmed by the statistical. Drunk drivers cause an annual death toll of over 25,000 and in the same time span cause nearly one million personal injuries and more than five billion dollars in property damage.") (internal quotation marks and citation omitted).

given the totality of the facts, that the Officers did not know their decision to do nothing, together with their affirmative actions, increased foreseeable, specific danger to a known class of persons— motorists on US 95 driving at the same time Kennedy drove toward Oregon.

While there was no direct interaction between the Officers and the Victims of Kennedy's drug induced erratic driving, the facts alleged are sufficient to find a facially pleaded state-created danger. That is, the Officers created foreseeable danger and acted with deliberate indifference to that danger. *Hunters Capital*, 499 F.Supp.3d at 901-03. The Court finds, as the Western District of Washington did in *Hunters Capital*, that even without direct knowledge of who specifically might be impacted by a state-created danger, the danger was created and directed at an identifiable group of individuals. *Id.*; ECF No. 50-1 ¶¶ 98-99. The Court finds Plaintiffs have adequately stated § 1983 claims against Schrimpf, Fischer and Gentry, and the doctrine of qualified immunity does not shield them from the claims.

### 2. Plaintiffs Fail to Allege Sufficient Facts Under Monell.

"In order to establish liability for governmental entities under *Monell*, a plaintiff must prove: (1) that the plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks, citation, and alterations omitted). A "failure to train can be a policy" for purposes of *Monell* liability, although the failure must be a "widespread practice." *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (internal quotation marks omitted). Thus, in order for Plaintiffs to state a claim against Nye County, Plaintiffs must assert that the training of Nelson, Fischer, Gentry, and Schrimpf was so lacking that it amounted to "deliberate indifference" to the rights of the person with whom the untrained officers come in contact. *See Dock v. State of Nevada*, Case No. 2:10-cv-00275-RCJ-LRL, 2010 WL 5441642, at *6 (D. Nev. Dec. 28, 2010).

Here, the Court finds Plaintiffs' pleadings fail to include facts sufficient to establish deliberate indifference with respect to training. A review takes the Court to Paragraphs 108, 109, 137, and 139 of the SAC. These paragraphs describe the County's policy of declining to enforce

laws against non-Nye County residents, a decision to partially revoke reprimands issued to the Potentially Liable Officers, and the conclusion that Nye County inadequately trains officers in sobriety tests, searches and seizure, and arises for impaired driving.  Together, in the absence of specific facts pertaining to training, these allegations fail to state a claim under *Monell* against Nye County base on a failure to train.

Plaintiffs also allege facts in support of their Due Process Claim against Nye County for failing to enforce DUI laws against non-Nye County residents.  Plaintiffs allege not only that this is the basis for the Officers' inaction in this case, but that after initially issuing Nelson, Schrimpf, Gentry, and Fischer "written reprimands for violating two separate departmental policies" Sheriff Wehrly rescinded those reprimands because the Officers only violated a "handling of evidence" policy, not the policy pertaining to identifying and apprehending persons who violate, *inter alia*, County laws.  ECF No. 50-1 ¶¶ 105-06.  Thereafter, the Sheriff refused to speak with the press regarding a Nye County policy requiring officers to prevent driving by those under the influence of intoxicating drugs or alcohol.  *Id*. at 107.  Plaintiffs allege by rescinding the reprimands and refusing to discuss the Officers' violation of the DUI policy, Sheriff Wehrly ratified the Officers' conduct.  However, ultimately, Plaintiffs allege only "on information and belief, that it is the policy, practice and custom of Nye County … to" take no action against intoxicated drivers, "particularly non-resident drivers."  This conclusion, even considered together with the facts specific to this case, is insufficient to support a claim that the County's failure to act in this circumstance was based on an implicit or explicit custom, policy or practice of deliberate indifference to Plaintiffs' constitutional, substantive due process rights.  The Court agrees that the County ratified the Officers' conduct when it rescinded discipline, but the rescission of the Officers' discipline is not sufficient to demonstrate a *Monell* policy claim.  Moreover, tolerating sexual harassment of detainees, failing to train with respect to shooting a dog, putting weekend warriors on the street, and even wrongfully detaining an individual for 18 days (*see id*. at ¶¶ 112-14) do not support a claim that the County has an implicit policy, ratified by Sheriff Wehrly, not to enforce DUI laws against non-Nye County residents.

The Court finds Plaintiffs have not alleged sufficient facts to state a constitutional claim against Nye County based on a failure to train or a failure to enforce DUI laws against non-Nye

County residents.  The Court does not find this claim is futile.  Rather, this claim may be sufficiently pleaded if a request to amend is made and granted in the future.  However, as pleaded, the Court recommends dismissal of Plaintiffs' Second Cause of Action seeking to assert municipal liability against Nye County under *Monell.*

The Court further finds Plaintiffs' claim against the Nevada Department of Public Safety fails.  A review of the SAC reveals Plaintiffs assert only a conclusory statement to support their claim against this state entity.  There are no allegations of any policies and procedures adopted by DPS that would form the basis for a *Monell* claim.  For this reason, the Court recommends Plaintiffs' motion seeking to file a Second Amended Complaint not proceed against DPS.  Whether another effort to amend is sought and granted is left to future filings, if any.

> 3. *Plaintiffs' State Negligence and Gross Negligence Claims Against the Individual Defendants.*

Under Nevada law, a negligence claim requires a plaintiff to allege: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached that duty; (3) the breach was the legal cause of the plaintiff's injury; and (4) the plaintiff suffered damages." *Scialabba v. Brandise Construction Co.*, 921 P.2d 928, 930 (Nev. 1996).  "Whether a defendant owes a plaintiff a duty of care is a question of law." *Id.*  Case law establishes "police officers unquestionably owe a duty of care to the general public." *Landeros v. Las Vegas Metropolitan Police Dep't*, Case No. 2:14-cv-1525 JCM (CWH), 2019 WL 1994456, at *3 (D. Nev. May 3, 2019) (internal quotations and citations omitted).

In this case, Plaintiff plead sufficient facts to establish all Potentially Liable Officers owed a duty to Plaintiffs not to subject them to an unreasonable risk of injury or harm, the Officers breached that duty, and the breach was the legal cause of the damages set forth in the SAC.[11]  ECF No. 50-1 ¶¶ 145-46, 151-55.  Whether there was a breach of that duty and causation for injuries are questions

---

[11] Plaintiffs' SAC includes no allegations supporting negligence claims against Defendants Mokeski and Champlin.  There is only allegation made against Defendant Stang that appears in paragraph 34.  ECF No. 50-1 ¶ 34.  In light of the failure to plead sufficient facts to state claims against Mokeski, Champlin, and Stang the Court finds Plaintiffs' negligence, gross negligence, wrongful death, negligent infliction of emotional distress, and intentional infliction of emotional distress are not adequately stated.  The Court recommends dismissing each of these claims against Mokeski, Champlin, and Stang without prejudice.

of fact not decided at this stage of the litigation. *Fernandez v. Penske Truck Leasing Co., L.P.*, Case No. 2:12-cv-295 JCM (GWF), 2012 WL 1832571, at *2 (D. Nev. May 18, 2012) (citation omitted).

However, the Court must decide whether discretionary function immunity found in NRS 41.032(2), or the public duty doctrine found in 41.0336 renders Plaintiffs' negligence claims futile.

### a.     Discretionary Function Immunity.

Defendants argue that Plaintiffs' state law claims are barred by NRS 41.032(2), which creates immunity for actions or failures to act when performing a discretionary function.  The Nevada Supreme Court adopted the test established in *Berkovitz-Gaubert v. U.S.*, 486 U.S. 531 (1988), when analyzing the scope of discretionary immunity.  *Maruszczak*, *supra*, 168 P.3d at 729.  To fall within the scope of discretionary immunity the decision made must "(1) involve an element of individual judgment or choice, and (2) be based on considerations of social, economic, or political policy." *Id*.[12]  Further, "the discretionary-function exception is not a bright-line rule"; rather, the *Berkovitz-Gaubert* test requires a case by case analysis to ensure the intent of the discretionary function exception is met—that is, preventing "second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id*. (internal citation omitted).  However, there is no discretionary function immunity when the alleged actions violate the Constitution or any other legal mandate.  *Kiessling v. Rader*, Case No. 2:16-cv-0690-GMN-NJK, 2018 WL 1475511, at *8 (D. Nev. Mar, 26, 2018), *citing Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011).  As stated in *Maruszczak*, "certain acts, although discretionary, do not fall within the discretionary-function exception's ambit because they involve negligence unrelated to any plausible policy objective."  168 P.3d at 446.

Here, as discussed above, the Court finds Plaintiffs sufficiently plead their state-created danger, constitution-based substantive due process claim against Nelson, Fischer, Gentry, and Schrimpf.  Thus, discretionary-function immunity does not bar Plaintiffs' negligence claims against these Defendants at the pleading stage of proceedings. *Id. citing Koiro v. Las Vegas Metro. Police*

---

[12]     As stated in *Berkovitz-Gaubert*, 486 U.S. at 536-37, "[a]ssuming the challenged conduct involves an element of judgment, a court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield.  The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  (Internal quote marks and citations omitted).

*Dep't.*, 69 F.Supp.3d 1061, 1074-75 (D. Nev. 2014); *Jarvis v. City of Mesquite Police Dep't.*, Case No. 2:09-cv-00851-PMP-GWF, 2012 WL 600804, at *5 (D. Nev. Feb. 23, 2012).

b.    The Public Duty Doctrine.

Similar to the analysis of federal claims under section 1983, there are two exceptions applicable to the public duty doctrine found in NRS 41.0336.  As explained in *Coty*, the duty owed by law enforcement "is one owed to the public, but not to individuals."  839 P.2d at 98-99 (internal citations omitted).

There are two exceptions to the public duty doctrine either of which will allow a negligence claim to proceed.  These include "(1) where a public agent, acting within the scope of official conduct, assumes a *special duty* by creating specific reliance on the part of certain individuals; or (2) where a public officer's conduct *affirmatively causes harm* to an individual." *Id.* at 99 (emphasis in original, internal quote mark and citation omitted).  "Affirmatively causes harm" is defined "as an act creating a dangerous situation which leads directly to the injurious result." *Id.* (internal citations and emphasis omitted.).

Plaintiffs allege the Officers affirmatively caused harm through their decisions—the affirmative act—to do nothing.  The Officers made their decisions despite knowledge of Kennedy's drug induced behavior.  Plaintiffs allege the Officers did nothing despite finding illegal drugs in Kennedy's car, at least some of which Kennedy had consumed resulting in intoxication, agitation, and erratic behavior.  Plaintiffs allege the Officers encouraged, if not required, Kennedy to get back on the road and drive north out of Nye County despite knowing he was under the influence of illegal substances and unable to safely operate a vehicle even after Kennedy stated he would use illegal drugs again after getting back on the road.  These pleaded facts are sufficient to establish the Officers created a situation that lead directly to the substantial harm Plaintiffs suffered.  At this early stage of proceedings, the Court finds the public duty doctrine does not shield the Officers from liability.

c.    Nye County Liability for Individual Officer Conduct under Respondeat Superior.

Nevada law permits an employer to be liable for an employee's negligence or intentional torts under respondeat superior.  *Brennan v. Las Vegas Metropolitan Police Dep't*, Case No. 2:20-

cv-00662-RFB-DJA, 2022 WL 990621, at *7 (D. Nev. March 31, 2022), *citing Busch v. Flangas*, 837 P.2d 438, 440 (Nev. 1992) (negligence); *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1180 (Nev. 1996) (intentional tort).  "An actionable claim on a theory of respondeat superior requires proof that (1) the actor at issue was an employee, and (2) the action complained of occurred within the scope of the actor's employment." *Id. citing Rockwell*, 925 P.2d at 1179.  Nye County may not be held liable for the actions of its officers if the underlying tort claims fail.  *Silveira v. Nye County, Nevada*, Case No. 2:18-cv-00207-MMD-NJK, 2019 WL 2570523, at *7 (D. Nev. Jun. 21, 2019).[13]

In this case, there is no dispute that Nelson, Schrimpf, Fischer, and Gentry were employees of Nye County through the Nye County Sheriff's Office.  There is similarly no dispute that the events that occurred in March 2021 were within the course and scope of the individuals' employment with Nye County.  Therefore, the question for the Court is whether Plaintiffs have alleged sufficient facts to state the underlying tort claims against all the individual officers. ECF No. 50-1 ¶¶ 145.  Because the Court finds Plaintiffs state the necessary elements of negligence claims against Nelson, Schrimpf, Fischer, and Gentry, the Court finds Plaintiffs have alleged sufficient facts to state a claim under respondeat superior against Nye County.  However, because the Court finds there are insufficient facts to state a negligence claim against Trooper Stang, the Court recommends dismissal of Plaintiffs' negligence claims against DPS based on respondeat superior liability.

### 4.  *Plaintiffs' State a Wrongful Death Claim Against Defendants.*

Under Nevada law, "[w]hen the death of any person ... is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death ..."  NRS 41.085(2).  The damages recoverable by the representatives of the estate may be awarded on the basis of "grief or sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering or disfigurement of the decedent."  NRS 41.085(3)-(5).  If a plaintiff is able to demonstrate the defendant's neglect caused the death alleged, the plaintiff may succeed in his or her

---

[13]     Defendants do not respond to Plaintiffs' claim that Nye County is liable for individual officer conduct.  ECF No. 51.

claim under the Nevada wrongful death statute.  *Estate of Isom by and through Love-Isom v. United States*, Case No. 2:14-cv-00475-RFB-VCF, 2018 WL 265569, at *4 (D. Nev. Jan. 1, 2018).

Because the Court finds Plaintiffs' claims of negligence against the individual Defendant Officers and Nye County (through respondeat superior) are adequately pled, and there is no dispute that Plaintiffs are the personal representatives of the decedents, the Court finds Plaintiffs have alleged sufficient facts to state a claim under NRS 41.085(2).

> 5.    *Plaintiffs' Claims of Negligent Hiring, Training, Retention, and Supervision are Sufficient Against Some Defendants.*

Negligent hiring, training, supervision, and retention is a long recognized tort claim under Nevada law.  *Hall v. SSF, Inc.*, 930 P.2d 94 (Nev. 1996).  However, only an employer has a duty to use reasonable care to hire, train, retain, and supervise its employees to ensure their employees are fit for the positions they hold.  *Id.*; *Blanck v. Hager*, 360 F.Supp.2d 1137, 1157 (D. Nev. 2005). Plaintiffs' claim under this cause of action asserted against the individual Defendants Nelson, Schrimpf, Gentry, Mokeski, Champlin, Fischer, and Stang—all non-employers—fails for this reason.  The Court recommends dismissing Plaintiffs' negligent hiring, training, supervision, and retention against all individual Defendants with prejudice.

Further, the claim of negligent hiring, training, supervision, and retention of police officers is barred by the discretionary function immunity doctrine as these activities are an integral part of government policy making.  *Beckwith v. Pool*, Case No. 2:13-cv-125 JCM (NJK), 2013 WL 3049070 (D. Nev. Jun. 17, 2013); *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) ("[D]ecisions relating to the hiring, training, and supervision of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield.") (citations omitted). Thus, the Court finds Plaintiffs' claim of negligent hiring, training, retention, and supervision against Nye County and DPS is barred and should be dismissed with prejudice.

6. *Plaintiffs State Claims of Intentional Infliction of Emotional Distress ("IIED") and Negligent Infliction of Emotional Distress ("NIED") Against Nelson, Schrimpf, Fischer, Gentry, and Nye County.*

a. <u>Plaintiffs State Claims of IIED Against Deputy Nelson, Lieutenant Schrimpf, Detective Fischer, Detective Gentry, and Nye County</u>.

To establish IIED in Nevada, Plaintiffs must sufficiently plead: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff [having] suffered severe or extreme emotional distress, and (3) actual or proximate causation." *Id.* "[E]xtreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (quotation omitted). A police officer engages in extreme and outrageous conduct when he or she "engages in an extreme abuse" of the position. *Perez v. Cox*, Case No. 2:15-cv-01572-APG-DJA, 2022 WL 2704803, at *14 (D. Nev. July 11, 2022) (internal quotations and citation omitted). The determination of whether a police officer's conduct amounts to an extreme abuse of the position is dependent on the facts of the case. *Compare McCall v. Las Vegas Metropolitan Police Dep't*, Case No. 2:18-cv-01319-APG-EJY, 2020 WL 1433579, at *20 (D. Nev. Mar. 23, 2020) (finding no extreme abuse where a plaintiff alleged he suffered emotional distress when a police officer gave plaintiff a trespass warning) *with Mitchell v. City of Henderson, Nevada*, Case No. 2:13-cv-01154-APG-CWH, 2017 WL 2841327, at **11-12 (D. Nev. Jul. 3, 2017) (finding there was a question for a jury whether police officers had committed extreme abuse of their positions when they aimed loaded weapons at the unarmed plaintiff, forcibly entered his home without a warrant, shot him with pepperballs when he posed no threat to the officers, and handcuffed and injured him while he was not resisting). The Court may make a legal finding that conduct is or is not outrageous, but "where reasonable people may differ, the jury determines whether the conduct was extreme and outrageous enough to result in liability." *Mitchell*, 2017 WL 2841327 at *11 *citing Chehade Refai v. Lazaro*, 614 F.Supp.2d 1103, 1121 (D. Nev. 2009); *Posadas v. City of Reno*, 851 P.2d 438, 444 (Nev. 1993) ("The jury was entitled to determine, considering prevailing circumstances, contemporary attitudes and [the appellant's] own susceptibility, whether the conduct in question constituted extreme outrage.") (citation omitted).

Further, a plaintiff asserting IIED must also allege "either a physical impact … occurred or ... serious emotional distress causing physical injury or illness …." *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998).  Said differently, to establish severe emotional distress, the plaintiff must demonstrate "the stress … [is] so severe and of such intensity that no reasonable person could be expected to endure it." *Alam v. Reno Hilton Corp.*, 819 F.Supp. 905, 911 (D. Nev. 1993).

Throughout their time spent with Kennedy, Plaintiffs' allege the Officers displayed complete indifference to the danger he posed as they told him they did not care about his possession (or use) of illegal narcotics, did nothing in response to Kennedy's expressed intent to use illegal drugs again, observed Kennedy's intoxication yet only seemingly cared about avoiding paperwork duties, told Kennedy there was no need to arrest him since he was heading to Oregon, and allowed Kennedy to return to his vehicle with his drugs still inside.  ECF No. 50-1 ¶¶ 38, 40-42, 57.  While the Officers' failure to arrest Kennedy would not be enough for Plaintiffs to allege outrageous conduct, as that inaction alone is shielded by the discretionary immunity doctrine, when the Officers directed an intoxicated Kennedy to his car where his keys had been placed (*id.* ¶ 58), and Deputy Nelson subsequently followed Kennedy toward the Nye County line allegedly speeding and crossing the highway center line (*id.* ¶¶ 72-74), the Officers engaged in conduct sufficient to support a facially valid claim that the Officers engaged in an extreme abuse of their positions.

Although the discretionary immunity doctrine typically shields law enforcement officers in Nevada from liability as a result of their failure to act, as discussed above, the Court finds Plaintiffs have alleged sufficient facts to state a claim that the actions of Defendants Nelson, Schrimpf, Fischer, and Gentry are not immune from state law liability.  Similarly, the purported interactions with and around Kennedy on the day of the crash by Nelson, Schrimpf, Fischer, and Gentry are properly alleged as affirmative acts that remove the public duty doctrine as a possible barrier to Plaintiffs' state law claims.

With respect to severe emotional distress, three of the occupants in the vehicle Kennedy hit head on died at the scene.  *Id.* ¶ 90.  Two were severely injured.  *Id.* ¶ 91.  The survivors and relatives of the deceased and injured passengers allege they have suffered extreme emotional pain, torment, mental anguish, loss of comfort and companionship, loss of affection, economic damages, future

earnings, costs and expenses incurred, physical pain and injury, distress, suffering, and monetary costs not yet ascertained. *Id.* ¶ 90, 153. In considering the scope of the tragedy endured by Plaintiffs the Court finds the emotional trauma and physical injuries alleged by Plaintiffs as a result of the collision to be in the category of those that no reasonable person should be expected to endure. While in past decisions the Court has held that simple discomforts such as stress, humiliation, and irritation are not enough to constitute the level of distress necessary to successfully state an IIED claim, the circumstances here are distinguishable. *Evans v. Lander County Hospital Dist.*, Case No. 3:19-cv-00464-LRH-WGC, 2021 WL 1933933, at **6-7 (D. Nev. May 13, 2021); *Alam*, 819 F.Supp. at 911. The alleged pain suffered is radically more severe. The Court finds Plaintiffs have adequately stated this prong of the IIIED claim.

Further, to hold Nye County liable for the actions of Officers Nelson, Schrimpf, Fischer, and Gentry, their conduct must have occurred within the course and scope of the Officers' employments. *Rockwell*, 925 P.2d at 1179. Because the actions of the individual Officers when interacting with Kennedy occurred in the scope of their official duties, respondeat superior is applicable. *Shafer v. City of Boulder*, 896 F.Supp.2d 915, 939 (D. Nev. 2012) ("[R]espondeat superior is a valid theory of liability against a government employer as to common law torts….") (internal quotations and citations omitted). For these reasons, the Court finds Plaintiffs' IIED claims against Nye County are adequately stated.

> b.   Plaintiffs State Claims of NIED Against Deputy Nelson, Lieutenant Schrimpf, Detective Fischer, Detective Gentry, and Nye County.

"[Under] Nevada law, an NIED claim by a direct victim [of the alleged conduct] has the same elements as an intentional infliction of emotional distress (IIED) claim, except that the plaintiff need only show that the acts causing distress were committed negligently." *Armstrong v. Reynolds*, 22 F.4th 1058, 1081-82 (9th Cir. 2022), *citing Abrams v. Sanson*, 458 P.3d 1062, 1070 (Nev. 2020). Because the Court concludes Plaintiffs have sufficiently pleaded the elements of IIED against the Officers (1) when they required Kennedy to continue driving on US 95, and (2) the emotional trauma suffered by Plaintiffs, the question for the Court is only whether Plaintiffs have shown the acts causing the distress were committed negligently. Plaintiffs' claims of negligence against Nelson,

Schrimpf, Fischer, Gentry, and Nye County (through respondeat superior), which the Court found are sufficiently alleged are adequate to supply the necessary pleading to establish the acts causing the emotional distress suffered by Plaintiffs was committed negligently.  For these reasons, the Court finds Plaintiffs' allegations of NIED against Nelson, Schrimpf, Fischer, Gentry, and Nye County may proceed.

> 7.  *Plaintiffs' 42 U.S.C. § 1983 Claims Asserting Interference with Family Relations Against Deputy Nelson, Schrimpf, Fischer, and Gentry May Proceed.  Plaintiffs' Claim Against Nye County Fails Under Monell.*

The Ninth Circuit recognizes "that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children."  *Wilkinson*, 610 F.3d at 554, *citing Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991).  "Official conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process."  *Id.* (internal citation omitted).  "The type of conduct which is most likely to rise to the conscience-shocking level is 'conduct intended to injure in some way unjustifiable by any government interest.'"  *Cotta v. County of Kings*, 79 F.Supp.3d 1148, 1177 (E.D. Cal. 2015), *citing County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).  "Conduct which was not intentional, but rather was deliberately indifferent, may nevertheless rise to the conscience-shocking level in some circumstances."  *Id. citing Lewis*, 523 U.S. at 849–50.

Courts apply one of two tests when deciding whether the conduct demonstrated by law enforcement officers shocked the conscience.  These include (1) the "deliberate indifference" test and (2) the "purpose to harm" test.  *Gantt v. City of Los Angeles*, 717 F.3d 702, 707 (9th Cir. 2013). The former is used when it is practical for an officer to inform his or her decision making with "actual deliberation."  *Id.* (citation omitted).  The latter is used when the officer is forced to make "a snap judgment because of an escalating situation."  *Id.* (citation omitted).  "To evaluate whether … official conduct rises to a conscience-shocking level, courts look at the totality of the circumstances." *Shidler v. County of San Bernardino*, Case No. 5:19-cv-00503-AB (SHKx), 2022 WL 2255005, at *9 (C.D. Cal. Mar. 7, 2022) (citation omitted).  The facts alleged here include that there was an approximate 45 minute time span during which Defendants investigated and discussed Kennedy's conduct, drug use and possession, and lack of a gun.  These facts are not ones that support a snap

1   judgment.  Thus, the Court determines whether Defendants' conduct demonstrated deliberate
2   indifference.  *Moreland v. Las Vegas Metropolitan Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998),
3   *citing Lewis*, 523 U.S. at 851.

4       Under this constitutional claim, deliberate indifference is defined as requiring a law
5   enforcement officer to recognize an "unreasonable risk and actually intend ... to expose the plaintiff
6   to such risks without regard to the consequences to the plaintiff."  *Rosales v. County of San Diego*,
7   511 F.Supp.3d 1070, 1088 (S.D. Cal. 2021), *citing Grubbs*, 92 F.3d at 899 (internal quotation marks
8   omitted).  "Whether officers had the requisite knowledge of a substantial risk is a question of fact
9   subject to demonstration in the usual ways, including inference from circumstantial evidence ... and
10  a factfinder may conclude that [an] official knew of a substantial risk from the very fact that the risk
11  was obvious."  *Id. citing Farmer v. Brennan*, 511 U.S. 825, 842 (1994).  The majority of applicable
12  case law involves fact patterns where the underlying violation alleged is deadly force.[14]

13      In this case, a jury could reasonably infer, based on facts alleged treated as true for this
14  analysis, that the Officers' interactions with Kennedy were deliberately indifferent to Plaintiffs'
15  Fourteenth Amendment rights.  The Officers had ample time to observe and speak to Kennedy as
16  well as talk among themselves.  The Officers are alleged to have known of Kennedy's conduct, drug
17  use (including methamphetamine and fentanyl), stated intent to use drugs again, obvious
18  intoxication, erratic behavior, and plan to drive.  The Officers chose inaction to avoid paperwork
19  despite knowing the foreseeable, substantial risk from the very obvious facts before them.  The
20  Officers exacerbated the situation with their show of force, but also made comments that may be
21  construed as emboldening Kennedy to continue his conduct knowing members of the Nye County
22  Sheriff's Department did not care about his drugs or drug use while driving.  As alleged, the Officers
23  chose to push Kennedy out of Nye County in order to avoid paperwork.  The totality of facts is
24  sufficient to find a jury could conclude the Officers' conduct shocks the conscience.  Because

25  ---
[14]     *See*, for example, *Calonge v. City of San Jose*, 523 F.Supp.3d 1101, 1105-06 (N.D. Cal. 2021) (denying
26  defendants' motion to dismiss on the grounds that plaintiff had adequately alleged facts that police officers had acted
    with deliberate indifference when they shot plaintiff's son despite having time to deescalate the situation); *Gibson v. Las
27  Vegas Metropolitan Police Dep't*, Case No. 2:12-cv-00900-GMN-CWH, 2013 WL 876291, at **3-4 (D. Nev. Mar. 7,
    2013) (holding that plaintiff had adequately stated a claim for a deprivation of the right to familial association under the
28  Fourteenth Amendment stemming from a fatal shooting of plaintiff's son following a thirty-minute standoff with law
    enforcement).

Plaintiffs allege facts sufficient to state a claim against Nelson, Schrimpf, Fischer, and Gentry and the claim, at this stage of proceedings, is not barred by qualified immunity, the Court finds Plaintiffs' interference with their rights to familial relations under the Fourteenth Amendment claim may proceed.  *See Penilla v. City of Huntington Park*, 115 F.3d 707, 711 (9th Cir. 1997) ("[B]ecause appellants were not entitled to qualified immunity for the violation of … [plaintiff's] due process rights, … [plaintiff] could pursue her own rights under the Fourteenth Amendment for deprivation of her liberty interest in her familial relationship with her son."); *see also Henderson v. County of Santa Cruz*, Case No. 14-cv-03544-RMW,  2015 WL 225429, at *5 (N.D. Cal. Jan. 16, 2015) (holding that state officials' failure to warn a family that their violent son had been released from custody was a deprivation of a surviving daughter's right to familial relations with her murdered parents).

However, any claim of liability against Nye County must be asserted under *Monell*.  Because there are no allegations in Plaintiffs' SAC of any official Nye County policy practices or custom of depriving citizens of their right to familial relations, the Court finds Plaintiffs do not state a claim against Nye County under the *Monell* doctrine.  The Court recommends dismissing Plaintiffs' Fourteenth Amendment interference with familial relations claim against Defendant Nye County without prejudice.

### 8. *Plaintiffs Fail to State a Claim of Civil Conspiracy*.

Plaintiffs' civil conspiracy allegations focus on the purported agreement by Defendant "to put an impaired driver on the road."  ECF No. 54 at 7.  "Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage."  *Conner v. Harrah's Operating Company, Inc.*, Case No. 3:08-cv-633-RCJ-RAM, 2010 WL 11639692, at *2 (D. Nev. Feb. 22, 2010), *citing Collins v. Union Federal Sav. & Loan Ass'n*, 662 P.2d 610, 622 (Nev. 1983); *O'Neal v. Las Vegas Metropolitan Police Dep't*, Case No. 2:17-cv-02765-APG-GWF, 2018 WL 4088002, at **7-8 (D. Nev. Aug. 27, 2018) (stating that the plaintiffs, after being faced with argument that a government agency cannot conspire with its employees, withdrew its civil conspiracy claim against the LVMPD).  Given this well settled law, the Court recommends

dismissing with prejudice Plaintiffs' civil conspiracy claims to the extent they allege conspiracies between individual Defendants and their employers. This includes the alleged conspiracy between Nelson, Schrimpf, Fischer, Gentry and Nye County, along with any alleged conspiracy between Trooper Stang and DPS.

Further, although it is possible to state a claim of conspiracy between governmental entities, the Court finds no allegations that any of the entities named conspired with another defendant entity to injure Plaintiffs. Thus, these claims are also recommended for dismissal without prejudice. *Rebel Communications, LLC v. Virgin Valley Water Dist.*, Case No. 2:10-cv-0513-LRH-GWF, 2015 WL 4172442, at *6 (D. Nev. July 9, 2015) (holding there remained a factual question whether the City of Mesquite and Virgin Valley Water District had conspired to harm the plaintiff).

Any actionable conspiracy must include a combination of two or more individual defendants who, through some concerted action, intend to accomplish an unlawful objective for the purpose of harming Plaintiffs, from which damages resulted. *Consolidated Generator-Nevada, Inc. v. Cummins Engine Company, Inc.*, 971 P.2d 1251 (Nev. 1998) (internal citations and quotation marks omitted).[15] The underlying unlawful objective does not necessarily need to be a tort recognized under Nevada law. *Cadle Co.*, 345 P.3d at 1052. The agreement between the conspirators may be explicit or tacit. *Dow Chemical Co. v. Mahlum*, 970 P.2d 98, 112 (Nev. 1998).

---

[15]  The Court recognizes Plaintiffs allege a civil conspiracy may be pleaded under Nevada law if the conspiracy is "done to benefit the conspirators, [and] it[s] natural and necessary consequences is the prejudice of the public or the oppression of the individuals." ECF No. 54 at 8 *citing Hotel Riviera*, 396 P.2d at 860-61. After reviewing federal and state case law nationwide, the Court located no decision, with the exception of one, adopting this standard as applicable to stating a civil conspiracy claim. Only in *Ungaro v. Desert Palace, Inc.* 732 F.Supp. 1522, 1532 n.3 (D. Nev. 1989), was the language from *Hotel Riviera* cited by another court. No district judge in the District of Nevada has adopted the language from *Hotel Riviera* in an analysis of a civil conspiracy claim. In fact, every district judge in this District, except Judges Silva and Traum who were just appointed in 2022, has analyzed civil conspiracy without referencing the *Hotel Riviera* language. *Urban Outfitters, Inc. v. Dermody Operating Company, LLC*, Case No. 3:21-cv-00109-MMD-CLB, 2022 WL 4134127, at *5 (D. Nev. Sept. 12, 2022); *Smith v. Craig*, Case No. 2:19-cv-00824-GMN-EJY, 2020 WL 1065715, at *8 (D. Nev. Mar. 4, 2020); *Honghui Deng v. Nevada ex rel. Board of Regents for Nevada System of Higher Educ.*, Case No. 2:17-cv-03019-APG-VCF, 2020 WL 1470866, at *2 (D. Nev. Mar. 25, 2020); *Wormwood v. North Las Vegas Police Dep't*, Case No. 2:15-cv-01438-JAD-GWF, 2016 WL 6915300, at *6 (D. Nev. Nov. 22, 2016); *Vail v. State*, Case No. 2:12-cv-01148-RFB-CWH, 2016 WL 81246, at *4 (D. Nev. Jan. 7, 2016). For this reason, the Court finds the language in *Hotel Riviera* (finding a conspiracy may be adequately alleged if done to benefit the conspirators and the natural and necessary consequences of the conspiracy prejudices the public or oppresses individuals) is not law upon which the Court relies in this case. However, even if this law is still applicable, the Court finds no concerted activity in which the "necessary consequences" prejudice the public or oppress individuals.

Plaintiffs state in conclusory fashion that "Defendants … conspired through agreement, explicitly and/or tacitly, to specifically harm Plaintiffs by putting a dangerous driver onto the road." ECF No. 50-1 ¶ 188.  However, even though stated, this conclusion does not sufficiently plead that the Officers acted with the purpose of specifically harming the Victims or Plaintiffs.  Because Plaintiffs have not plausibly alleged the actions of Defendants constitute such an intent to injure Plaintiffs, the Court finds Plaintiffs have not adequately pleaded a claim of civil conspiracy against Nelson, Schrimpf, Fischer, and Gentry.  Thus, the Court recommends dismissal without prejudice of the civil conspiracy claim against these Defendants.

## III.   ORDER

IT IS HEREBY ORDERED that Plaintiffs' Motion for Leave to File Their Second Proposed Second Amended Complaint in Accordance with FRCP 15(a) (ECF No. 50) is GRANTED in part as follows:

1.   Plaintiffs' § 1983, substantive due process claim may proceed against Defendants Breanna Nelson, Alan Schrimpf, Daniel Fischer, and Brooke Gentry;

2.   Plaintiffs' negligence and gross negligence claims may proceed against Defendants Breanna Nelson, Alan Schrimpf, Daniel Fischer, Brooke Gentry, and Nye County (under respondeat superior);

3.   Plaintiffs' wrongful death claim may proceed against Defendants Breanna Nelson, Alan Schrimpf, Brooke Gentry, and Nye County (under respondeat superior);

4.   Plaintiffs' intentional infliction of emotional distress claim may proceed against Defendants Breanna Nelson, Alan Schrimpf, Brooke Gentry, and Nye County (under respondeat superior);

5.   Plaintiffs' negligent infliction of emotional distress claim may proceed against Defendants Breanna Nelson, Alan Schrimpf, Brooke Gentry, and Nye County (under respondeat superior); and,

6.   Plaintiffs' interference with family relations claim may proceed against Defendants Breanna Nelson, Alan Schrimpf, Daniel Fischer, and Brooke Gentry.

1    IV.    **RECOMMENDATION**

2          IT IS HEREBY RECOMMENDED that all claims against Defendants Michael Mokeski,

3    Isaac Champlin, and Luke Stang be dismissed without prejudice.  Plaintiffs fail to allege sufficient

4    facts to state claims against these Defendants.

5          IT IS FURTHER RECOMMENDED that Plaintiffs' Second Cause of Action alleging

6    municipal liability against Nye County and the Nevada Department of Public Safety be dismissed

7    without prejudice for failure to state a claim.

8          IT IS FURTHER RECOMMENDED that Plaintiffs' negligence and gross negligence claims

9    against Nevada Department of Public Safety be dismissed without prejudice for failure to state a

10   claim.

11         IT IS FURTHER RECOMMENDED that Plaintiffs' negligent hiring, training, supervision,

12   and retention claim be dismissed against all Defendants with prejudice.

13         IT IS FURTHER RECOMMENDED that Plaintiffs' interference with family relations claim

14   against Nye County be dismissed without prejudice for failure to state a claim.

15         IT IS FURTHER RECOMMENDED that Plaintiffs' civil conspiracy claim be dismissed

16   with prejudice to the extent Plaintiffs (1) plead Defendants Breanna Nelson, Alan Schrimpf, Daniel

17   Fischer, and Brooke Gentry conspired with Nye County, (2) Trooper Stang conspired with the

18   Nevada Department of Public Safety, and (3) that Nye County and the Nevada Department of Public

19   Safety conspired.

20         IT IS FURTHER RECOMMENDED that Plaintiffs' claim of civil conspiracy between or

21   among Defendants Breanna Nelson, Alan Schrimpf, Daniel Fischer, and Brooke Gentry be

22   dismissed without prejudice for failure to state a claim.

23         Dated this 23rd day of February, 2023.

24

25   ELAYNA J. YOUCHAH
     UNITED STATES MAGISTRATE JUDGE
26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>NOTICE</u>**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).