1
2
3
4
5
6
7
8
9
10
11
12
13

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CHELSEA ROBERTS, individually and as heir of deceased G.E.D., a minor, et al.,

Plaintiffs,

v.

NYE COUNTY, et al.,

Defendants.

Case No. 2:22-cv-00398-RFB-EJY

**ORDER**

## I.      INTRODUCTION

Before the Court is Defendant Nye County's Motion to Dismiss the Amended Complaint; and Defendants Isaac Champlin, Daniel Fischer, Brooke Gentry, Michael Mokeski, Breanna Nelson, and Alan W. Schrimpf's (collectively "Individual Officers" or "Officers") Motion to Dismiss the Amended Complaint. ECF Nos. 85, 87. Also pending before the Court is Plaintiffs' Motions for Leave to File Supplemental Authority. ECF Nos. 95, 112. For the reasons stated below, the Court grants the motions to dismiss in part and denies the motions to dismiss in part. The Court denies Plaintiffs Motion for Leave to File Supplemental Authority, ECF No. 95, and grants in part Plaintiffs' second Motion for Leave to File Supplemental Authority, ECF No. 112.

## II.     PROCEDURAL BACKGROUND

Plaintiffs commenced this action by filing a complaint in the Judicial District Court of Nevada, County of Nye, on December 10, 2021. Plaintiffs then filed an Amended Complaint in the Fifth Judicial District Court of Nevada on February 7, 2022. This matter was removed from the Eighth Judicial District Court of Nevada to the United States District Court for the District of Nevada, on March 2, 2022. ECF No. 1.

On March 25, 2022, four motions to dismiss were filed. On April 26, 2022, Plaintiff filed a motion for leave to file an amended complaint. ECF No. 32. On November 18, 2022, Josh Myers moved to join the action as Plaintiff. ECF No. 57. On February 28, 2023, the Honorable Elayna J. Youchah, United States Magistrate Judge, denied Movant Josh Meyers motion to join under Federal Rule of Civil Procedure 20 but granted Josh Meyers's motion to intervene. ECF No. 76.

On March 13, 2023, Judge Youchah granted Defendants' motion to stay discovery. ECF No. 79. Discovery has remained stayed. On March 14, 2023, the Court denied in part and adopted in part Judge Youchah's Report and Recommendation. ECF No. 80. The Court's order permitted Plaintiffs to file a Second Amended Complaint ("SAC"), amending the fifth cause of action (negligent hiring, training, supervision, and retention) and eighth cause of action (civil conspiracy), and denying all pending motions to dismiss without prejudice as to refiling subsequent to the filing of the SAC.

Plaintiffs filed their SAC on March 20, 2023. ECF No. 81. On March 30, 2023, all Defendants re-filed their motions to dismiss. ECF Nos. 83, 84, 85, 86, 87. Plaintiffs filed a Non-Opposition to Defendant Nevada Highway Patrol & Trooper Luke Stang's motion (ECF No. 83). Plaintiffs also filed a Non-Opposition to Defendant United States of America's, Bureau of Land Management ("BLM"), and Ryan Gallagher's motion (ECF No. 84). Plaintiffs never responded to Defendant Nye County Sheriff's Office's motion (ECF No. 86). The Nye County Sheriff's Office filed a "Notice of Non-Opposition" on April 24, 2023. ECF No. 92.

The remaining motions, from Defendants Nye County and the Individual Officers, ECF Nos. 85, 87, were fully briefed on April 24 and April 28, 2023 respectively. On May 1, 2023, the Individual Officers joined Defendant Nye County's Reply in support of their motion and Nye County's opposition to the motion for leave to amend the complaint (ECF Nos. 991, 51). Plaintiffs filed a motion for leave to file a supplemental authority on May 16, 2023. ECF No. 95. The Individual Officers responded on May 25, 2023. ECF No. 96.

On October 30, 2023, Plaintiff Josh Meyers filed an emergency motion to consolidate this case with 2:23-cv-00478-CDS-EJY, which was pending before the Honorable Cristina D. Silva,

United States District Judge. This Court and Judge Silva determined that the Meyers case arose out of the same accident and facts as the Roberts case. Accordingly, on November 6, 2023, the Court granted the motion to consolidate. ECF No. 104.

On December 5, 2023, Plaintiff Meyers filed a joinder to Plaintiff Roberts's responses to the two contested motions to dismiss. On December 22, 2023, the parties filed a joint stipulation to dismiss Nevada Highway Patrol and Trooper Stang from the consolidated action 2:23-cv-00478-CDS-EJY. The Court granted this stipulation on December 26, 2023. ECF No. 108.

On February 12, 2024, Plaintiffs filed a second motion to take notice of supplemental authority. ECF No. 112. On February 16, 2024, the Court held a hearing on the pending motions to dismiss. At the hearing, Plaintiffs advised the Court that they are conceding their claims against Trooper Luke Stang and Nevada Department of Public Safety Highway Patrol Division; the United States, Bureau of Land Management, and Officer Gallagher; and the Nye County Sheriff's Office. Accordingly, the Court granted each of these parties' Motions to Dismiss. See ECF No. 113 (granting ECF Nos. 83, 84, and 86). The Court heard oral argument on the remaining motions and took the matters under advisement. This order follows.

### III.    FACTUAL ALLEGATIONS

The following factual allegations are drawn from the Second Amended Complaint ("SAC"). On March 27, 2021, Michael Durmeier and his fiancé, Lauren Starcevich, were driving from Teton County, Idaho, to Las Vegas, Nevada with Starcevich's daughter, E.K.S., and Durmeier's minor children, G.E.D. and J.E.D. Plaintiff Chelsea Roberts is the mother of G.E.D. and J.E.D. At approximately 3:50PM, the family was driving southbound on US-95 in Nye County, Nevada when a northbound vehicle driven by Tyler Kennedy, who was under the influence of methamphetamine and fentanyl, crossed the centerline and collided with their vehicle at high speed. As a result of the crash, Durmeier, G.E.D., and Starcevich were killed. J.E.D. and E.K.S. suffered serious injuries, including a traumatic brain injury to J.E.D.

Roughly two and a half hours before the collision, Kennedy, who had slept in his car on the side of the highway, got into an altercation with the owner of an RV park. Kennedy mimed

pointing his cell phone at the owner as if it were a gun. Kennedy left the RV park northbound on US-95. But realizing that he was too high to drive, quickly turned around and returned to park at the Area 51 Alien Center and Brothel across the highway from the RV park.

At approximately 1:20 p.m., the RV park's owner called 911, stated that Kennedy had asked him for methamphetamine and then fired a gun at him, and described Kennedy, his vehicle, and his location. Approximately twenty minutes later, Kennedy was in the process of smoking fentanyl in the parking lot of the Area 51 Alien Center and Brothel when Nye County Deputy Breanna Nelson, responding to the earlier 911 call, arrived. Nelson's approach startled Kennedy, who "jumped out of his skin." Kennedy then attempted to conceal evidence of his drug use before exiting his vehicle at Nelson's instruction.

Over approximately the next forty-five minutes, at least eight law enforcement officers from three departments arrived on the scene and participated in the detention of Kennedy, including Bureau of Land Management Officer Ryan Gallagher and Nye County Detectives Daniel Fischer and Brooke Gentry, Lieutenant Alan Schrimpf, Michael Paul Mokeski, Trainee Isaac Champlin and Nevada Highway Patrol Trooper Luke Stang.

After Nelson and at least one other Officer Defendant repeatedly reassured Kennedy that they did not care about Kennedy's illegal drug use and that they would not take criminal action against Kennedy unless they found a firearm or "100 pounds of marijuana" in his vehicle, Kennedy consented to a full search of the vehicle. Nelson searched Kennedy's truck and found the remains of two fentanyl pills in aluminum foil, along with blackened foil that had been used for smoking fentanyl and/or methamphetamine. Nelson finished searching Kennedy's truck without seizing Kennedy's main stashes of fentanyl and methamphetamine or most of his paraphernalia.

Kennedy was visibly agitated throughout the search. Kennedy informed the Defendant Officers that he was on a road trip from Arizona to Oregon. Kennedy also told the Officers that he drove off "really fast" from the RV Park because he was "scared out of [his] mind."

After determining that the purported gunshot had been a firework going off, the Defendant Officers abandoned all attempts to investigate or detain Kennedy. As the Defendant Officers began

4

preparing to depart, Nye County Detectives Gentry and Fischer had a conversation with Kennedy, in which Fischer told Kennedy, "We're looking for guns. If you ain't got a gun, we don't give a shit." Fischer then admonished Kennedy for pointing his cell phone like a gun, and Gentry told Kennedy to, "Drive safe." Less than twenty seconds later, Nye County Lieutenant Schrimpf told Fischer that Kennedy was "chasing pills." Fischer replied, "Yeah, eyes are pinpoint. He's probably under the influence." Gentry suggested that Nelson—who would be responsible for writing a report on Kennedy—should "[j]ust tell him not to do drugs" rather than write a report.

Nelson and Schrimpf then had a final exchange with Kennedy. Nelson, referring to the small amount of fentanyl and/or methamphetamine she had seized, told Kennedy, "Alright, yeah bro, your pills are going in the trash, alright? Don't do drugs." In reference to the pill Nelson seized, Kennedy responded "that's what I was worried about." Nelson asked: "that one pill is what you're worried about?" Kennedy responded: he had to smoke pills or else he'd get sick. Nelson said, "I mean, you don't have to do nothing." Kennedy responded, "I don't want to be sick." Schrimpf then said, "Alright, that's your choice." Schrimpf then stated, "You're going to Oregon, so I don't need to trespass you today."

Kennedy, correctly interpreting the officers' suggestions that he should get back on the road, said, "Alright, I'm gonna go in and get what I was coming here for, and then I'll be on my way." Schrimpf responded, "Okay," to which Nelson added, "Yeah, your keys are on the front seat of your car."

At no point during their detention of Kennedy did any Defendant Officer perform or suggest performing a sobriety test on Kennedy despite Kennedy being demonstrably under the influence of drugs, nor did any Defendant Officer propose either arresting Kennedy or even continuing to detain Kennedy until he was safe to drive, nor did any propose consulting a superior about how to address Kennedy's impaired state.

Most of the Defendant Officers then departed the scene. Nelson remained in the parking lot, watching from her patrol car until Kennedy returned to his truck a few minutes later. At approximately 2:25 p.m., Kennedy, still impaired by methamphetamine and fentanyl, drove his

truck onto US-95 heading north. Nelson pulled her patrol car onto the highway after Kennedy and began following him toward the county line, which was roughly a two-hour drive away. Nelson followed Kennedy for between thirty minutes and approximately one hour.

During the time that Nelson followed Kennedy, she watched him violate traffic laws, including speeding and drifting across the centerline. After witnessing these various traffic violations by Kennedy without intervention, Nelson stopped following him. Nelson took no action against Kennedy for his erratic and illegal driving.

At approximately 3:30 p.m.—between five and thirty-five minutes after Nelson stopped following him—Kennedy crossed the centerline repeatedly to pass a group of twelve vehicles while traveling at approximately ninety miles per hour. At approximately 3:50 p.m., Kennedy again crossed the centerline to pass multiple vehicles at high speed. This time, the opposite lane was occupied by the vehicle driven by Durmeier. Kennedy's truck struck Durmeier's vehicle head-on, throwing Starcevich and G.E.D. from their vehicle and killing them instantly. Durmeier was left trapped, hanging upside down in their overturned vehicle, where he died a few minutes later. J.E.D. survived with life-threatening injuries and brain damage that left him in a coma for weeks. E.K.S. survived with serious injuries.

Witnesses who rendered aid to Kennedy observed illegal substances and paraphernalia in the passenger seat of Kennedy's vehicle, including a glass pipe, a clear baggie containing a white powder, and a short piece of straw. A piece of burnt tin foil was also found underneath Kennedy when he was removed from the vehicle. Witnesses gathered these materials and placed them behind the truck's rear tire for law enforcement to catalogue.

In April of 2021, Nye County Sheriff Wehrly issued a letter stating that, as a result of the events of March 27, 2021, Defendants Nelson, Schrimpf, Gentry, and Fischer had been issued written reprimands for violating two separate departmental policies: Policy 1000 and Policy 0043.

Policy 1000 provides that "[i]t is the policy of the Nye County Sheriff's Office patrol to protect and to provide quality emergency services to all persons within the county by actively seeking to identify and apprehend those person(s) responsible for committing violations of city,

county, state and federal laws." Policy 0043 relates to the proper handling of evidence.

The following month, Wehrly issued a second letter stating that, "after further review it was determined" that Nelson, Schrimpf, Gentry, and Fischer had violated only Policy 0043 regarding the handling of evidence but not Policy 1000 regarding the protection of the community. Wehrly refused to answer press questions regarding whether the Officers violated Policy 3009, which provides: "Individuals under the influence of intoxicating . . . drugs observed prior to the act of driving a motor vehicle shall, as possible, be prevented from driving."

Nye County has a practice of allowing volunteer "weekend warrior" police officers to make key decisions when they are insufficiently trained and motivated to follow police policies. Lieutenant Schrimpf—who was the ranking officer on the scene with Kennedy—is one of these weekend warriors and runs a contracting company as his day job.

Wehrly indicated that an "internal audit" conducted in 2015 had "found a very long list of problems," with some "still being worked on." Wehrly stated: "And the cause of these audit findings is usually that your policies and procedures are bad, and we found out that was true, or your training is bad, and we found out that was true as well, or you just have people who are not doing what the policies and procedures tell them to do."

During the criminal proceedings against Kennedy, Nye County Sheriff's Detective Seargant Morgan Dillon was asked, "Well, we could assume that a law enforcement officer with Nye County Sheriff's Office wouldn't let somebody get into a vehicle high or with dope, wouldn't we?" The Detective's answer was revealing: "I've worked for Nye County for a long time; I don't assume anything."

## IV.   LEGAL STANDARD

### a.   Motion to Dismiss

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and

1
2

are construed in the light most favorable to the non-moving party." <u>Faulkner v. ADT Sec. Services, Inc.</u>, 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted).

3
4
5
6
7
8
9
10
11
12
13

  To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action. . . ." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." <u>Id.</u> at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in <u>Twombly</u> and <u>Iqbal</u>, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." <u>Moss v. U.S. Secret Service</u>, 572 F.3d 962, 969 (9th Cir. 2009).

14
15

### V.   DISCUSSION

16
17
18
19
20

  Based on the above alleged facts, Plaintiffs bring a 42 U.S.C § 1983 claim against the individual officers and Nye County under the Fourteenth Amendment and <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1977). Plaintiffs also bring state law tort claims for negligence, gross negligence, negligent hiring, training, and supervision, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil conspiracy. Defendant Nye County and the Individual Officer Defendants move to dismiss all of Plaintiffs' causes of action.

21

#### a.   42 U.SC. § 1983 Claim – Due Process

22
23
24
25
26
27

  A plaintiff must establish two essential elements to prevail under 42 U.S.C. § 1983: (1) the violation of a right secured by the Constitution or laws of the United States, and (2) that the alleged violation was committed by a person acting under color of state law. <u>Crumpton v. Gates</u>, 947 F.2d 1418, 1420 (9th Cir. 1991). The parties do not dispute and the Court agrees that Defendants were acting under color of law when the events at issue took place. Therefore, the only issue is whether there was a deprivation of a constitutional right.

28

1   The general rule is that a state actor is not liable under the Due Process Clause "for its

2   omissions." Pauluk v. Savage, 836 F.3d 1117, 1122 (9th Cir. 2016). However, there are two

3   exceptions to this general rule, and Plaintiffs rely on one of these—the "state-created danger"

4   exception. Id. To state a due process claim under the state-created danger doctrine, a plaintiff must

5   allege the following three elements: (1) the defendants "affirmative actions created or exposed

6   [them] to an actual, particularized danger that [they] would not otherwise have faced"; (2) "the

7   injur[ies they] suffered [were] foreseeable"; and (3) "the officers were deliberately indifferent to

8   the known danger." Martinez v. City of Clovis, 943 F.3d 1260, 1271 (9th Cir. 2019).

9   Defendants argue that they did not create the danger because they did not engage in conduct

10   that would cause a reasonable person distress and Kennedy would have used drugs while driving

11   whether or not the Officers encountered him.

12   The Court finds that Plaintiffs have alleged all three elements against Officers Nelson,

13   Schrimpf, Gentry, and Fischer.[1]

14   First, the Officers' alleged actions plainly constitute affirmative conduct. The Officers did

15   not solely fail to perform sobriety tests or arrest Kennedy. Instead, they actively encouraged

16   Kennedy to get back on the road and leave Nye County. Schrimpf's statement, "you're going to

17   Oregon, so I don't need to trespass you today," implied that Kennedy would face criminal

18   consequences if he did not leave the jurisdiction. Nelson told Kennedy where his car keys were.

19   She also waited in her patrol vehicle while Kennedy went into the Area 51 store. When Kennedy

20   left the store, her vehicle was still in the parking lot. Nelson's continued presence in the parking

21   lot sent a clear message to Kennedy that he needed to follow through on leaving the area. Nelson

22   then followed Kennedy for thirty to sixty minutes while he drove north on US-95. She continued

23   to follow him even after she observed him driving erratically and weaving over the center line.

24   Second, the Officers' actions left Plaintiffs in a "more dangerous situation than [they]

---

[1] The Court finds Plaintiffs fail to allege sufficient facts to state a § 1983 claim against Mokeski and Champlin. The allegations do not demonstrate these officers increased any danger to Plaintiffs or that they were deliberately indifferent to the danger posed by Kennedy. Even though the Court gave Plaintiffs leave to amend their complaint, there are still no specific allegations regarding Mokeski or Champlin. For these reasons, the Court will dismiss Plaintiffs' § 1983 claims against Mokeski and Champlin.

already faced." <u>Kennedy v. City of Ridgefield</u>, 439 F.3d 1055, 1064 n.5 (9th Cir. 2006). Prior to the Officers' encounter with Kennedy, Kennedy had decided to pull over because he recognized he was too intoxicated to drive. The Officers encouraged Kennedy to leave the parking lot and therefore the SAC plausibly alleges that the Officers put Kennedy on the road in proximity to Plaintiffs when he otherwise would not have been. Nelson's pursuit of Kennedy increased Kennedy's fear and agitation. He began driving at high speeds and crossing the center line to pass the vehicles in front of him as a result. <u>See</u> <u>Hernandez v. City of San Jose</u>, 897 F.2d 1125, 1137 (9th Cir. 2018) (finding complaint met this element where plaintiffs alleged "they would have made it 'to safety' had the Officers not affirmatively directed them into the crowd of protesters.").

Third, the injury to Plaintiffs was foreseeable. The SAC sufficiently alleges that the Officers were on notice that Kennedy was intoxicated. The SAC alleges that the Officers found drugs in their search of his car, and Kennedy told the Officers that he needed to smoke fentanyl to avoid withdrawal symptoms. The SAC also states that the Officers verbally noted their observations that Kennedy was high. Fischer spoke to Schrimpf, who stated that Kennedy was "chasing pills." Fischer replied, "Yeah, eyes are pinpoint. He's probably under the influence." The Officers were also on notice that Kennedy was in an agitated and fearful state. He "jumped out of his skin" when Nelson first approached his car and told the officers that he had driven "really fast" from the RV Park because he was "scared out of [his] mind." He also appeared visibly agitated throughout the search of his vehicle. Nelson observed Kennedy weaving in and out of traffic and over the center line while she followed him for thirty to sixty minutes. The harm in this case, a head-on collision, was highly foreseeable based on the inherent danger associated with Kennedy driving on a high-speed highway while intoxicated. <u>See</u> <u>Wood v. Ostrander</u>, 879 F.3d 583, 590 (9th Cir. 1989) ("the inherent danger facing a woman left alone at night in an unsafe area [was] a matter of common sense.").

Fourth, the Officers were deliberately indifferent to the known danger. To establish deliberate indifference, the plaintiff must plead that the defendant "recognize[d] the unreasonable risk and actually intend[ed] to expose the plaintiff to such risks without regard to the consequences

to the plaintiff.'" <u>Herrera v. L.A. Unified Sch. Dist.</u>, 18 F.4th 1156, 1158 (9th Cir. 2021) (quoting <u>L.W. v. Grubbs</u>, 92 F.3d 894, 899 (9th Cir. 1996)). Deliberate indifference requires a 'culpable mental state' more than 'gross negligence.'" <u>Pauluk v. Savage</u>, 836 F.3d 1117, 1125 (9th Cir. 2016). Here, the Officers were aware that Kennedy was presently intoxicated, fearful, and agitated at the time they were speaking with him and nonetheless encouraged him to begin driving. The danger of someone in Kennedy's state driving on a high-speed highway with no center divider was obvious. They acted with disregard for the obvious consequences. Instead, they were singularly focused on having him leave Nye County. Other than briefly telling him that he should abstain from using drugs, they did nothing to mitigate the danger such as warning other drivers or preventing him from driving by detaining him. <u>See</u> <u>Martinez v. City of Clovis</u>, 943 F.3d 1260 (9th Cir. 2019) (finding deliberate indifference where officers knew individual was violent, individual was already under investigation for domestic abuse against ex-girlfriend, officers had probable cause yet failed to arrest him and instead engaged in disparaging small talk with him); <u>Hernandez</u>, 897 F.2d at 1137 (finding deliberate indifference to harm to pro-Trump rally attendees where officers knew that assaults had already occurred earlier in the day, officers witnessed violent criminal acts, yet continued to direct the attendees towards the mob).

Finally, the danger was actual and particularized. Defendants argue that the danger posed by Kennedy affected all drivers on the US-95 equally and therefore was not particularized. But while affirmative state action that exposes a broad swath of the public to "generalized dangers" cannot support a state-created-danger claim, a danger can be "particularized" when it is directed towards a group rather than an individual. <u>Polanco v. Diaz</u>, 76 F.4th 918, 927 (9th Cir. 2023).

In <u>Sinclair v. City of Seattle</u>, 61 F.4th 674 (9th Cir. 2023), no state created danger was found where an individual was shot in the protester-held area of Seattle ("CHOP zone"). Even though city officials had pulled out law enforcement, ignored the lawlessness and crime occurring, and portrayed the area as a peaceful, cop-free protest zone, the court found the danger was insufficiently particularized because it was directed towards an entire zone of the city and affected all CHOP visitors equally. However, the <u>Sinclair</u> panel distinguished the facts from another case

involving Seattle's CHOP zone where a particularized danger was found, <u>Hunters Capital LLC v. City of Seattle</u>, 499 F. Supp. 3d 888 (W.D. Wash. 2020). The panel explained that <u>Hunters Capital</u> involved a group that lived in or owned businesses within the CHOP zone, which "significantly narrow[ed] the class of persons exposed to the alleged state-created danger." <u>Id</u>. at 683. Likewise, in <u>Hernandez</u>, 897 F.3d 1125 (9th Cir. 2018), the danger was sufficiently particularized when police shepherded a crowd of thousands of pro-Trump rally attendees into a crowd of violent protesters. Finally, several months after <u>Sinclair</u>, in <u>Polanco v. Diaz</u>, 76 F.4th 918 (9th Cir. 2023), the court found a particularized danger where the officials actions exposed a "discrete and identifiable group"—prison guards and inmates at San Quentin—to the dangers of COVID-19.

The facts of this case are closer to <u>Hernandez</u>, <u>Polanco</u>, and <u>Hunters Capital</u> than to <u>Sinclair</u>. Plaintiffs have adequately alleged that the drivers on a remote section of the US-95 around the time Kennedy was encouraged to get back on the road were a small group of individuals; analogous to the number of inmates and prison guards at San Quentin prison in <u>Polanco</u> and far less than the thousands of pro-Trump rally attendees in <u>Hernandez.</u> It is also significant that the collision is alleged to have occurred just five to thirty-five minutes after Nelson stopped following Kennedy, that the officers knew Kennedy was presently intoxicated while driving, and that Nelson had observed him driving erratically. The danger posed by the Officers' actions was not a generalized danger that affected every driver on the U.S. 95 equally. The danger disproportionately affected the discrete group of drivers that were on the road during the immediate timeframe where Kennedy was known to be presently intoxicated and driving erratically. Further, in <u>Sinclair</u>, the individual was harmed by someone he knew and had a history of antagonism with. By contrast, the proximity between the Officers' conduct and the harm is much greater here because Kennedy collided with Plaintiffs between five and thirty-five minutes after Nelson stopped following him.

Accordingly, the Court denies Defendant Nye County's and the Individual Officers' motions to dismiss Plaintiffs' Section 1983 claim on this ground.

**b. Qualified Immunity**

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability, and it "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, (1) whether the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id.

Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (brackets in original omitted). "This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City and County of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (brackets in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. Further, the right must be defined at "the appropriate level of generality . . . [, and the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also Ashcroft, 563 U.S. at 741-42.

The Court finds that Officers Nelson, Schrimpf, Gentry, and Fischer are not entitled to qualified immunity. The Court has already determined that the SAC alleges a violation of Plaintiffs' constitutional due process right under the state-created danger doctrine. The Court now considers whether this right was clearly established at the time of the violation.

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court further finds that Plaintiffs have met their burden in proving that the right was clearly established at the time of the violation. Tarabochia, 766 F.3d at 1125. First, the law governing the Officers' conduct was clearly established. Defendants argue that at the time of their alleged conduct, the right to have another individual subjected to a sobriety test and arrested was not clearly defined and there was no constitutional duty to arrest Kennedy based on the information actually known to the officers. This states the right too narrowly. By 2021, it was well-established that law enforcement officers are liable for affirmative actions that increase the danger of severe injury to a group rather than an individual. Although there are no cases within the Ninth Circuit that apply the state-created danger doctrine to the intoxicated driving context, "there doesn't need to be a prior case with materially similar facts in order for a right to be clearly established." Elliot-Park v. Manglona, 592 F.3d 1003 (9th Cir. 2010).  The relevant inquiry is whether "in the light of pre-existing law, the unlawfulness [of the conduct is] apparent," not whether "the very action in question has previously been held unlawful." Hernandez, 897 F.3d at 1138 (citing Hope v. Pelzer, 536 U.S. 730, 743 (2002).

Here, the violative nature of the Officers' particular conduct was clearly established at the time. In both Hernandez and Johnson v. City of Seattle, 474 F.3d 634 (9th Cir. 2007), the Ninth Circuit explained that "affirmative conduct akin to directing someone involuntarily into dangerous conditions" was a violation of the state-created danger doctrine. Hernandez, 897 F.3d at 1138 (quoting Johnson, 474 F.3d at 640). The Ninth Circuit also found that "confining victims to an area where they would be exposed to risk of harm by a private party" was impermissible. Id. Here, the Officers knew that they were directing Kennedy onto the road with Plaintiffs and a handful of other vehicles travelling this remote section of the US-95, where there were no real alternative routes and thus no way to avoid Kennedy. The Officers' affirmative conduct was akin to "directing someone involuntarily into dangerous conditions" Hernandez, 897 F.3d at 1138, and "confining the plaintiffs to a place where they would be exposed to a risk of harm by private persons." Johnson, 474 F.3d at 640.

The Court concludes that Officers Nelson, Schrimpf, Gentry, and Fischer are not entitled

14

to qualified immunity and denies the Individual Officers' Motion to Dismiss on this ground.

### c.  **Monell** Liability

A municipal entity may also be sued under Section 1983 for "their own illegal acts." Connick v. Thompson, 563 U.S. 51, 60 (2011). "They are not vicariously liable under § 1983 for their employees' actions." Id. Under Monell, when a municipal policy of some nature is the "driving force" behind an unconstitutional action taken by municipal employees, the municipality will be liable. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Further, under Monell, a plaintiff can recover based on three different theories: a)"commission," a local government implementing its official policies or established customs, such as inadequate training of governmental officials; b) "omission," the government's omission to an official policy, such as a failure to train; or c) "ratification," a policymaker's purposeful approval of an employee's unconstitutional conduct. Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249-50 (9th Cir. 2010). A municipality is liable for their failure to train "only where it reflects a deliberate indifference to the constitutional rights of its inhabitants." City of Canton v. Harris, 489 U.S. 378, 392 (1989).

Defendant Nye County asserts that Plaintiffs fail to state a Monell claim because the SAC does not allege a widespread practice of failure to train and the allegations regarding Wehrly's rescission of the reprimands, is not by itself, sufficient to establish a custom or practice.

The Court finds, at this stage of the litigation, that Plaintiffs have alleged sufficient facts to support Monell liability under the omission theory. The SAC alleges that Nye County failed to train its officers in detecting and detaining or arresting impaired drivers. It further alleges that Nye County allowed volunteer 'weekend warrior' police officers to make such decisions when they are not sufficiently trained in police policy. This allegation is further supported by the fact that Lt. Schrimpf, the highest-ranking officer at the scene, was one such "weekend warrior" who had a day-job running a contracting business. The SAC further notes the sworn testimony from Detective Dillon during the state criminal trial against Kennedy. When asked if Nye County Officers would let Kennedy get into a vehicle high, Dillon responded "I've worked for Nye County for a long

time; I don't assume anything." Additionally, in a 2015 audit, Wehrly acknowledged that the Nye County Sheriff's "policies and procedures are bad," its "training is bad," and "you just have people who are not doing what the policies and procedures tell them to do." Accepting these allegations as true, Plaintiffs have alleged a widespread practice of inadequate training for its officers, including its senior officers such as Schrimpf. This inadequate training was likely to result in the violation of constitutional rights such that the county can reasonably be said to be deliberately indifferent to the need. Harris, 489 U.S. at 390.

The Court also finds that Plaintiffs have alleged sufficient facts to state a plausible Monell claim under the ratification theory. Wehrly initially issued written reprimands for violations of Policy 1000 (related to identifying and apprehending law violators) and Policy 0043 (related to handling of evidence), but later determined that the Officers had not violated Policy 1000. Additionally, Wehrly refused to answer press questions regarding whether the Officers had violated Policy 3009, which provides: "Individuals under the influence of intoxicating . . . drugs observed prior to the act of driving a motor vehicle shall, as possible, be prevented from driving." Wehrly's decision to rescind the reprimands for violations of Policy 1000 and her refusal to issue reprimands under Policy 3009 plausibly ratified the Officers' conduct and provides additional evidence of a widespread practice or policy of inadequate training and supervision. See Henry v. County of Shasta, 132 F.3d 512, 520 (1997) ("the subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy."). Therefore, Plaintiffs' Monell claim may only proceed based on an omission and ratification theory.

### d. Public Duty Doctrine

The Individual Officers and Nye County argue that they are immune under the public duty doctrine and therefore all of Plaintiffs' negligence-based claims, including the wrongful death claim, fail as a matter of law.[2]

Nevada follows the public duty doctrine, which holds that the duty of fire and police

---

[2] As with the § 1983 claims, there are no specific allegations in the SAC against either Mokeski or Champlin with respect to any of the negligence-based or wrongful death claims. Therefore, these claims—gross negligence, NIED, and wrongful death—are also dismissed against them.

departments is owed to the public, not specific individuals. <u>Coty v. Washoe Cty.</u>, 108 Nev. 757, 839 P.2d 97, 99 (Nev. 1992). There are two exceptions to the doctrine. <u>Id.</u> Plaintiffs rely on the second exception, which applies when the conduct of the officer "affirmatively causes" the harm. Nev. Rev. Stat. § 41.0336.(2).

The term "affirmatively caused the harm," as used in NRS Section 41.0336(2), means that "a public officer must actively create a situation which leads directly to the damaging result." <u>Coty</u>, 839 P.2d at 99. The Nevada Supreme Court has not explicitly stated whether the causation standard under the "affirmatively caused the harm" exception to the public duty doctrine is identical to the causation analysis for negligence. However, the Court concludes from the Nevada Supreme Court's reference to "legal cause," that the two are sufficiently analogous. <u>Coty</u>, 839 P.2d at 760-61.

Causation, a necessary element to find negligence, consists of two components: actual cause and proximate cause. To demonstrate actual causation, a party must demonstrate that "*but for* defendant's negligence, his or her injuries would not have occurred." <u>Sims v. Gen. Tel. & Elecs.</u>, 815 P.2d 151, 156 (Nev. 1991), *overruled on other grounds by* <u>Tucker v. Action Equip. & Scaffold Co., Inc.</u>, 951 P.2d 1027 (Nev. 1997). To demonstrate legal or proximate cause, a party must show that the defendant could have foreseen that his or her negligent conduct could have caused a particular variety of harm to a certain type of plaintiff. <u>Id.</u> at 156.

Plaintiffs have pled that the officers actively created the situation. The Court has already found that the Officers did not simply fail to act. They affirmatively told Kennedy, who they knew was intoxicated, that he needed to leave Nye County. They encouraged him to leave by driving his car while intoxicated. They implied that he would be arrested or detained if he did not leave.

The Court further finds that the Officers' conduct was both the actual "but-for" and proximate cause of Plaintiffs' harm. But for the Officers' insistence that Kennedy continue on his way to Oregon, the collision with Plaintiffs would not have occurred. Because, as discussed previously, the harm to Plaintiffs was foreseeable, the Officers' conduct was also the proximate cause of Plaintiffs' injuries. Therefore, the public duty doctrine does not apply.

### e. Discretionary-Act Immunity

Defendants also argue that they are immune from all of Plaintiffs' state tort claims under NRS Section 41.032(2), Nevada's discretionary immunity statute. The Individual Officer Defendants assert that the decision to arrest is a discretionary function entitled to immunity under the act. Defendant Nye County asserts that it is entitled to discretionary immunity on Plaintiffs' Negligent Hiring, Training, and Supervision claim as well.

Under NRS Section 41.032(2), no action can be brought against an officer or employee of the state or any of its agencies or political subdivisions "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." A state actor raising this defense must show (1) that the questioned decision involved personal judgment, choice, or deliberation and (2) that the decision was based on considerations of social, economic, or political policy. Martinez v. Maruszczak, 168 P.3d 720, 722, 728-29 (Nev. 2007).

However, there are two limitations on discretionary-act immunity. First, immunity does not attach for actions taken in bad faith. Falline v. GNLV Corp., 107 Nev. 1004, 823 P.2d 888, 891 (1991); Davis v. City of Las Vegas, 478 F.3d 1048, 1059 (9th Cir. 2007). Second, acts taken in violation of the Constitution cannot be considered discretionary. Mirmehdi v. United States, 689 F.3d 975, 984 (9th Cir.2011); Nurse v. United States, 226 F.3d 996, 1002 (9th Cir. 2000). Finally, certain acts, although discretionary, do not fall within the discretionary-function exception's ambit because they involve "negligence unrelated to any plausible policy objectives." Martinez v. Maruszczak, 168 P.3d 720, 727 (Nev. 2007).

#### i. Negligent Hiring, Training, and Supervision

Here, Plaintiffs' assert that Defendant Nye County negligently hired, trained, retained, or supervised the Officers under their control and this resulted in the failure to follow protocol during the stop of Kennedy. Typically, decisions related to training, supervision, and retention are subject to discretionary immunity because they "usually involve policy judgments of the type Congress intended the discretionary function exception to shield." Nurse, 226 F.3d at 1001; Vickers v.

18

United States, 228 F.3d 944, 950 (9th Cir. 2000).

However, the Court must still consider the first step of the discretionary immunity test—whether there is a statute, regulation, or other legal authority that would confine Nye County's discretion in the first place. See Miller v. United States, 992 F.3d 878, 890 (9th Cir. 2021). The allegations underlying this cause of action and the Monell claim both rely in part on Nye County's failure to train its officers with respect to department policy and Nevada traffic laws which resulted in the injury to Plaintiffs. As discussed above, the complaint plausibly alleges that Nye County's failure to train is itself a municipal practice or policy that is the "driving force" behind the unconstitutional action taken by the Officers. While ordinary negligence in training would generally be subject to discretionary immunity, negligence that violates a constitutional mandate is not. "In general, governmental conduct cannot be discretionary if it violates a legal mandate." Nurse, 226 F.3d at 1002 (interpreting the FTCA's discretionary function exception, which mirrors Nevada's discretionary-act immunity test). Therefore, the Court finds that at this stage of the pleadings, discretionary immunity is not a bar to Plaintiffs' negligent, hiring, training, and supervision claim.

### ii.   Negligence-Based and Wrongful Death Claims

The Court further finds that discretionary-act immunity does not apply to Plaintiffs' negligence-based and wrongful death claims against all Defendants. First, the Officers' conduct, as alleged in the SAC, violated the Plaintiffs' constitutional due process right. Second, even if the Officers did not commit a constitutional violation, the SAC alleges that the Officers' decision to arrest Kennedy and encourage him to drive was taken in bad faith as it was based on a desire to avoid writing a report or a disregard for Nevada law and department policy. The Court does not find this to qualify as a policy, social, or economic reason contemplated by the act, nor does this constitute a reasonable basis for the Officers' decision. "Acts are committed in bad faith when the actor chooses a course of action without a reasonable basis or with knowledge or reckless disregard for a lack of reasonable basis." Falline, 107 Nev. at 1009 n.3. Finally, the Officers' alleged actions in this case are so far outside the bounds of ordinary care that they can be characterized as plain

1    negligence unrelated to any plausible policy objectives.

2        **f.  Negligence and Gross Negligence**

3        Defendants do not dispute that the elements for negligence and gross negligence have been

4    sufficiently pled. Instead, they argue that the Officers cannot be held liable under Nevada's public

5    duty doctrine and discretionary-act immunity. For the reasons stated above, the Court finds neither

6    doctrine applies. Because Defendants do not raise any further challenges to these causes of action,

7    Plaintiffs' claims for Negligence and Gross Negligence against Nye County (through respondeat

8    superior) as well as Officers Nelson, Gentry, Schrimpf, and Fischer will proceed.

9        **g.  Wrongful Death**

10        Nevada's wrongful death statute provides that "[w]hen the death of any person . . . is caused

11    by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives

12    of the decedent may each maintain an action for damages against the person who caused the death

13    . . . ." NRS Section 41.085(2). Heirs in a wrongful death suit are entitled to recover "pecuniary

14    damages for the person's grief or sorrow, loss of probable support, companionship, society,

15    comfort and consortium, and damages for pain, suffering or disfigurement of the decedent." NRS

16    Section 41.085(4). The personal representative of the decedent's estate is also entitled to recover

17    special damages, including funeral expenses. NRS Section 41.085(5)(a).

18        Defendants argue that this claim is barred under the public duty doctrine and discretionary

19    act immunity. The Individual Officers further argue that Plaintiffs have failed to plead a wrongful

20    death claim because the "Officers took no actions that caused the deaths of certain Plaintiffs."

21        The Court has already found that the public duty and discretionary immunity doctrines do

22    not bar Plaintiffs claims for negligence and gross negligence against Officers Nelson, Schrimpf,

23    Fischer, and Gentry. Further, beyond these two doctrines, Defendants do not dispute that Plaintiffs

24    allege facts sufficient to state a claim for negligence and gross negligence, and the Court has further

25    found that both "but for" and proximate causation have been properly pled. The Officers'

26    negligence and gross negligence caused G.E.D.'s, Starcevich's, and Durmeier's death. The SAC

27    states that Plaintiff Roberts and J.E.D. are the heirs of Decedent G.E.D. Plaintiffs have therefore

28

adequately pled a wrongful death cause of action.

The Court further finds that these facts are sufficiently pled against Defendant Nye County through the doctrine of respondeat superior. Under Nevada law, vicarious liability requires "proof that (1) the actor at issue was an employee, and (2) the action complained of occurred within the scope of the actor's employment." Rockwell v. Sun Harbor Budget Suites, 925 P.2d 1175, 1179 (Nev. 1996); see Busch v. Flangas, 837 P.2d 438, 440 (Nev. 1992) (respondeat superior liability available for negligent conduct). The SAC sufficiently alleges that the Nelson, Fischer, Gentry, and Schrimpf were all employees of Nye County and the actions complained of occurred within the scope of their employment. Plaintiffs' wrongful death claim may therefore proceed against these four officers and Nye County.

### h.  IIED and NIED claims

A plaintiff alleging a claim of intentional infliction of emotional distress ("IIED") must plead that defendants (1) engaged in extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) that the plaintiff suffered severe or extreme emotional distress; and (3) that actual or proximate causation exists between Defendant's conduct and Plaintiff's injury. Star v. Rabello, 97 Nev. 124, 125 (Nev. 1981).[3] Liability for emotional distress is reserved for acts that "shock the conscience." Id. Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community. Maduike v. Agency Rent-A-Car, 953 P.2d 24 (Nev. 1998) (per curiam). Nevada uses a sliding-scale approach for IIED claims. The more extreme the conduct, the less evidence required for proving emotional distress. See Blige v. Terry, 540 P.3d 421 (Nev. 2023).

Nevada state law allows for an individual to recover for negligent infliction of emotional distress ("NIED") when they are a bystander or a direct victim of negligence on the part of the tortfeasor. Shoen v. Amerco, Inc., 896 P.2d 469, 477 (Nev. 1995).

Defendants argue here, as elsewhere, that Plaintiffs' NIED cause of action is barred under

---

[3] There are no specific allegations in the SAC against either Mokeski or Champlin with respect to Plaintiffs' IIED claim; accordingly this claim is dismissed against them as well.

21

the public duty doctrine and discretionary-act immunity. Defendants further argue that Plaintiffs have failed to allege facts that meet the basic elements of both their IIED and NIED claims. For the reasons stated above, the Court does not find that the public duty doctrine or discretionary immunity apply to Plaintiffs' negligence-based causes of action, including the NIED claim. The Court now turns to the sufficiency of the allegations.

i.  <u>Intentional Infliction of Emotional Distress</u>

The Court finds that Plaintiffs adequately plead a IIED claim against Nelson, Schrimpf, Gentry, and Fischer as well as Nye County through respondeat superior liability. Based on the allegations in the SAC, and for the reasons discussed in detail above, the Court finds that Defendants' conduct was outside the bounds of decency and shocks the conscience. The Court further finds that the SAC properly alleges Defendants acted with reckless disregard for causing emotional distress. Plaintiffs sufficiently allege that the Individual Officers knew Kennedy was presently high, fearful, and agitated. The officers nonetheless encouraged Kennedy to drive, observed him driving erratically and illegally, and did nothing to mitigate the danger.

As to the second element, Plaintiff Roberts has sufficiently pled severe emotional distress on behalf of J.E.D. who was in the collision and suffered both physical injury and emotional distress. Plaintiff Robert has also plausibly pled an IIED claim in her individual capacity. She alleges severe emotional distress resulting from the death of her child, G.E.D.; the serious injuries sustained by her other child, J.E.D.; and the death of the father of her children, Durmeier. The fact of these fatalities and injuries is in and of itself "objectively verifiable indicia" that Plaintiff Roberts "suffered extreme or severe emotional distress." <u>Blige,</u> 540 P.3d at 432. The Officers' alleged "conduct in this case was so extreme that [Plaintiff Roberts] is not required to show more." <u>Id.</u> Finally, Plaintiff has adequately pled proximate causation. The emotional and physical injuries to her and J.E.D. was a foreseeable consequence of the Defendants' actions.

ii.  <u>Negligent Infliction of Emotional Distress</u>

1.  *Direct Victim NIED claim*

Under <u>Shoen</u>, a direct victim of negligence may recover under NIED if they can establish

emotional damages. <u>Shoen</u>, 896 P.2d at 477. However, the Nevada Supreme Court recently described <u>Shoen's</u> holding in a parenthetical as "allowing for negligent infliction of emotional distress if the acts arising under intentional infliction of emotional distress were committed negligently." <u>Abrams v. Sanson</u>, 136 Nev. 83, 92, 458 P.3d 1062, 1070 (2020); <u>see</u> <u>Armstrong v. Reynolds</u>, 22 F.4th 1058, 1081-82 (9th Cir. 2022). Under this second theory, the elements for direct victim-NIED are the same elements as IIED except that the acts are done negligently.

The elements of the approach, Nevada courts have consistently required some physical manifestation of injury to sustain a direct victim NIED claim. Where "emotional distress damages are not secondary to physical injuries, but rather, precipitate physical symptoms, either a physical impact must have occurred or, in the absence of physical impact, proof of 'serious emotional distress' causing physical injury or illness must be presented." <u>Barmettler v. Reno Air, Inc.</u>, 956 P.2d 1382 (Nev. 1998). Thus, unlike IIED, a physical injury is required and there is no sliding scale approach in NIED-direct victim cases.

The Court does not need to decide which NIED approach is proper; Plaintiff Roberts cannot bring a direct victim claim under either as she has not alleged physical injury to herself. The SAC states "Plaintiffs suffered severe and extreme emotional distress, pain and suffering," but does not describe any physical symptoms resulting from this distress. And "insomnia and general physical or emotional discomfort [can]not support a claim for negligent infliction of emotional distress." <u>Chowdhry v. NLVH, Inc.</u>, 851 P.2d 459 (Nev. 1993).

On the other hand, Plaintiff Roberts has properly alleged a NIED direct victim claim on behalf of J.E.D. under either theory. Plaintiffs plead the elements of negligence as well as the elements of IIED, and Plaintiffs have alleged that J.E.D. suffered serious physical injuries.

### 2. Bystander NIED claim

"For a plaintiff to recover for emotional distress caused by witnessing harm to another the plaintiff must prove the defendant's negligent conduct was the proximate cause of the harm to the victim." <u>State v. Eaton</u>, 710 P.2d 1370, 1376 (Nev. 1985). The emotional injury must be reasonably foreseeable. Courts evaluate three factors for this inquiry and a plaintiff must show she was: "1)

23

closely related to the victim of an accident, 2)[] located near the scene of the accident, and 3) suffer[ed] a shock resulting from direct emotional impact stemming from the sensory and contemporaneous observance of the accident." Crippens v. Sav on Drug Stores, 114 Nev. 760 (1998) (citing Eaton, 710 P.2d at 1377-78).

Plaintiff Roberts cannot recover under the bystander theory in her individual capacity because she did not contemporaneously observe the accident.

However, the Court finds Plaintiffs adequately plead a NIED claim on behalf of J.E.D. against Nelson, Schrimpf, Gentry, Fischer, and Nye County through respondeat superior liability. First, J.E.D. contemporaneously witnessed the collision and was also the immediate family member of two of the victims, G.E.D. and Durmeier. Second, the Court has already found that the SAC properly alleges that the Defendants acted negligently, their conduct proximately caused harm to victim, and the emotional injury to J.E.D. was "reasonably foreseeable." J.E.D. and Durmeier suffered catastrophic injuries, including dismemberment, and died in the collision. G.E.D. was J.E.D.'s sister. Durmeier was J.E.D.'s father.

Plaintiffs claim for NIED is therefore dismissed to the extent it is brought in Roberts's individual capacity, but the NIED cause of action may proceed on behalf of J.E.D.

### i.   Interference with Familial Relations

"For more than a century, the Supreme Court has recognized parental constitutional rights to the care, custody, and control of minor children." Sinclair, 61 F.4th at 678. "[P]arents have a Fourteenth Amendment liberty interest in the companionship and society of their children. Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010) (citing Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.1991)). Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process. Id. (quoting Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008)).

In determining what shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." Porter, 546 F.3d at 1137 (quoting Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 372 (9th Cir.1998)

(internal quotation marks omitted)). "Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience." Wilkinson, 610 F.3d at 554. However, "[w]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." Id. For example, a purpose to harm might be found where an officer uses force to bully a suspect or "get even." Id.

Based on the allegations in the SAC, the Court finds that there was time for "actual deliberation." The Officers interacted with Kennedy, discussed the conduct in question, encouraged him to drive impaired and proceeded to follow Kennedy and observe his impaired driving.[4] Thus, the Court applies the deliberate indifference test to determine whether the Officers' conduct shocked the conscience.

Because family relations claims and the state-created danger exception are both grounded in substantive due process under the Fourteenth Amendment, the test for deliberate indifference is the same. See, e.g., Nicholson v. City of Los Angeles, 935 F.3d 685 (9th Cir. 2019) (analyzing a deadly force claim under the Fourteenth Amendment and holding that a plaintiff may prevail by showing that the officer "disregarded a known or obvious consequence of his action.")

Because the Court has found that the Officers acted with deliberate indifference in causing the state-created danger, Plaintiffs have adequately pled interference with familial relations against Officers Nelson, Schrimpf, Gentry and Fischer. The Court also finds that Plaintiffs have sufficiently pled this claim against Nye County because the SAC plausibly alleges that a municipal practice or policy was a driving force behind the Officers' actions. Sinclair, 61 F.4th at 680 (finding city acted with deliberate indifference where the actions resulted from a municipal policy).

### j. Civil Conspiracy

"An actionable conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another,

---

[4] Again, the SAC makes no specific allegations against either Mokeski or Champlin with respect to Plaintiffs' family relations claim. The Court therefore dismisses this cause of action against Mokeski and Champlin as well.

25

and damage results from the act or acts." <u>Hilton Hotels Corp. v. Butch Lewis Productions, Inc.</u>, 862 P.2d 1207, 1210 (Nev. 1993). "The gist of a civil conspiracy is not the unlawful agreement but the damage resulting from that agreement or its execution. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff." <u>Eikelberger v. Tolotti</u>, 611 P.2d 1086 (Nev. 1980).

Plaintiffs allege that the Defendant Officers conspired through agreement to specifically harm Plaintiffs by putting a dangerous driver onto the road and the Officers intended to conceal evidence and engage in a cover up for the purpose of harming Plaintiffs.

The Court finds that Plaintiffs fail to state a conspiracy claim against any of the Individual Officers. Nelson, Schrimpf, Fischer, and Gentry agreed to encourage Kennedy to drive out of Nye County; however, the allegations do not support that they 'intended' to harm the Plaintiffs. While their actions were in reckless disregard to a foreseeable harm to people like Plaintiffs traveling on the particular highway, this does not mean that they intended to cause such individuals harm. This claim therefore fails.

Plaintiffs rely on <u>Hotel Riviera v. Short</u>, 396 P.2d 855, 859-60 (Nev. 1964) to argue that conspiracy may lie if the conspiracy is "done to benefit the conspirators, [and] it[s] natural and necessary consequences is the prejudice of the public or the oppression of the individuals." But the Nevada Supreme Court has repeatedly stated since <u>Hotel Riviera</u> that a civil conspiracy requires "an unlawful objective for the purpose of harming another." <u>See, e.g.</u>, <u>Consol. Generator-Nevada, Inc. v. Cummins Engine Co.</u>, 971 P.2d 1251 (Nev. 1998) ("We hold that since there is no evidence that [defendants] agreed and intended to harm [the plaintiff,] CGN, the district court was correct in granting both parties' motions for summary judgment on the civil conspiracy issue."); <u>see also</u> ECF No. 75 at 39 n.15 ("After reviewing federal and state case law nationwide, the Court located no decision, with the exception of one [district court opinion], adopting [the <u>Hotel Riveria</u>] standard as applicable to stating a civil conspiracy claim."). The allegations do not support an 'unlawful objective' by the Defendants.

Plaintiffs' second allegation, that Defendants conspired to conceal the fact that they

allowed Kenney to drive in his vehicle while intoxicated, also fails to state a claim. Although Plaintiffs were known to Defendants by that time, Plaintiffs do not allege what damages or injury resulted from this concealment. The damages in this case arise out of the collision, which occurred prior to any concealment. This is a separate and independent basis for dismissing the civil conspiracy claim. The Court therefore grants the Officers' Motion to Dismiss with respect to Plaintiff's conspiracy claim.

### k. Motions to take Notice of Supplemental Authority

The Local Rules require the parties to obtain leave of the Court before filing any supplemental briefs; surreplies are not permitted without leave of the court. L-R 7-2(g). The Court may grant leave to file supplemental authority "for good cause" found. Id. "Good cause may exist either when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP, 526 F. Supp. 3d 805, 812 (D. Nev. Mar. 17, 2021).

Plaintiffs' first request that the Court take notice of a concurrence in Rogers v. Jarrett, 63 F.4th 971, 979–981 (5th Cir. 2023). This concurrence argues that qualified immunity is founded on clerical error. Plaintiffs make the argument only to preserve it for appeal. Defendants oppose. The Court does not find that the authority is precedential or particularly persuasive or helpful. The supplemental authority is an out-of-circuit concurrence with non-analogous facts. The Court therefore denies Plaintiffs' first motion to take notice of supplemental authority.

Plaintiffs' second motion asks the court to take notice of a district court opinion and Ninth Circuit opinion; both are related to the state-created danger doctrine. Est. of Soakai v. City of Oakland, No. 23-cv-00381-SK, at *19 (N.D. Cal. Nov. 28, 2023); Polanco v. Diaz, 76 F.4th 918 (9th Cir. 2023). The Court identified and relied on Polanco in its discussion of the state-created danger doctrine and finds this case to be precedential. However, the Court does not consider non-binding authority to be precedential or helpful in its analysis. The Court therefore grants the motion as to Polanco v. Diaz and denies it as to Est. of Soakai v. City of Oakland.

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.     CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Nye County's Motion to Dismiss (ECF No. 85) is **GRANTED** in part and **DENIED** in part.

- Plaintiffs' <u>Monell</u> claim under 42 U.S.C § 1983 may proceed only to the extent it is based on an omission or ratification theory.
- The <u>Monell</u> claim is dismissed without prejudice as to all other grounds.
- Plaintiffs' claim for civil conspiracy is dismissed without prejudice.
- The remaining claims against Nye County may proceed.

**IT IS FURTHER ORDERED** that the Defendants Isaac Champlin, Daniel Fischer, Brooke Gentry, Michael Mokeski, Breanna Nelson, and Alan W. Schrimpf's Motion to Dismiss (ECF No. 87) is **GRANTED** in part and **DENIED** in part.

- The Court dismisses Officers Champlin and Mokeski from the entirety of the action.
- Plaintiffs NIED claim may proceed only to the extent it is brought on behalf of J.E.D. The NIED claim is dismissed without prejudice as to all other grounds.
- Plaintiffs' claim for civil conspiracy is dismissed without prejudice.
- The remaining claims against the Individual Officers may proceed.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Take Notice of Supplemental Authority (ECF No. 95) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Take Notice of Supplemental Authority (ECF No. 112) is **GRANTED** in part and **DENIED** in part. The Court takes notice of <u>Polanco v. Diaz</u>, 76 F.4th 918, 927 (9th Cir. 2023) only.

DATED: March 31, 2024.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**