**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

CHELSEA ROBERTS, *et al.*,

Plaintiffs,

v.

NYE COUNTY SHERIFF's OFFICE, a subdivision of the STATE OF NEVADA, *et al.*,

Defendants.

Case No. 2:22-cv-00398-RFB-EJY

**ORDER DENYING SUMMARY JUDGMENT**

Before the Court are three motions: Plaintiffs Josh Myers, as parent and legal guardian on behalf of E.K.S., a minor child, and Chelsea Roberts's Motion for Partial Summary Judgment (ECF No. 145); Defendants Breanna Nelson, Alan W. Schrimpf, Brooke Gentry, and Daniel Fischer's Motion for Summary Judgment (ECF No. 146); and Defendant Nye County's Motion for Summary Judgment (ECF No. 147).

For the reasons stated below, Plaintiffs' motion and Defendants' motions are denied.

## I. PROCEDURAL HISTORY

Plaintiffs Josh Myers, as parent and legal guardian on behalf of E.K.S., a minor child, and Chelsea Roberts ("Plaintiffs") commenced this action on March 2, 2022. See ECF No. 1. On April 26, 2022, Plaintiffs moved for leave to file an amended complaint. See ECF No. 32. Plaintiffs filed their Second Amended Complaint ("SAC") on March 20, 2023. In the SAC, Plaintiffs bring eight causes of action. First, Plaintiffs allege that the Officer Defendants are liable under 42 U.S.C. § 1983 for violating their due process rights, and rights to be free from interference with familial relations (the "Section 1983 Claims"). Next, Plaintiffs allege that the Officer Defendants are liable for negligence, gross negligence, negligent and intentional infliction of emotional distress, and

wrongful death (the "Tort Claims"). Additionally, Plaintiff alleged that Officer Defendants participated in civil conspiracy. Plaintiffs further allege that Nye County is liable for Officer Defendants' actions ("Monell Liability"). All defendants named in the SAC filed motions to dismiss on April 3, 2023. The Court granted those motions in part, and denied them in part. More specifically:

> - Plaintiffs' Monell claim under 42 U.S.C § 1983 may proceed only to the extent it is based on an omission or ratification theory.
> - The Monell claim is dismissed without prejudice as to all other grounds.
> - Plaintiffs' claim for civil conspiracy is dismissed without prejudice.
> - The remaining claims against Nye County may proceed.
>
> [. . .]
>
> - The Court dismisses Officers Champlin and Mokeski from the entirety of the action.
> - Plaintiffs NIED claim may proceed only to the extent it is brought on behalf of J.E.D. The NIED claim is dismissed without prejudice as to all other grounds.
> - Plaintiffs' claim for civil conspiracy is dismissed without prejudice.
> - The remaining claims against the Individual Officers may proceed.

Roberts v. Nye Cnty., No. 222CV00398RFBEJY, 2024 WL 1380626, at *16–17 (D. Nev. Mar. 31, 2024). On August 18, 2025, Plaintiffs, Defendants Breanna Nelson ("Nelson"), Alan W. Schrimpf ("Schrimpf"), Brooke Gentry ("Gentry"), and Daniel Fischer's ("Fischer") (collectively, "Officer Defendants"), and Nye County ("County Defendants") filed their instant motions for summary judgment. See ECF Nos. 145–47. The Court heard argument on the instant motions on April 23, 2026. See ECF No. 172.

This Order follows.

## II. FACTUAL BACKGROUND

### A. Undisputed Facts

#### i. *Events Surrounding the Crash*[1]

---

[1] The following facts are drawn from the Second Amended Complaint, ECF No. 81 [hereinafter, "SAC"]; Officer Defendants' Answer to Plaintiffs' SAC, ECF No. 116; Defendant Nye County's Answer to Plaintiffs' SAC, ECF No.

On March 27, 2021, Michael Durmeier and his fiancé, Lauren Starcevich, were driving from Teton County, Idaho, to Las Vegas, Nevada with Starcevich's daughter, E.K.S., and Durmeier's minor children, G.E.D. and J.E.D. Plaintiff Chelsea Roberts is the mother of G.E.D. and J.E.D. At approximately 3:50 PM, the family was driving southbound on US-95 in Nye County, Nevada when a northbound vehicle driven by Tyler Kennedy, who was under the influence of methamphetamine and fentanyl, crossed the centerline and collided with their vehicle at high speed. As a result of the crash, Durmeier, G.E.D., and Starcevich were killed. J.E.D. and E.K.S. suffered serious injuries.

Prior to the crash, Tyler Kennedy ("Kennedy") had been traveling from Arizona to Oregon by way of US-95. He had spent the night sleeping in his vehicle parked at a gas station across the street from the Alien Travel Center area in Lathrop Wells, Nevada.

At about 1:20 PM on March 27, 2021, Kennedy had an altercation with the owner of a nearby RV parking lot. During that altercation, the RV park owner threatened to shoot Kennedy if he did not leave. In response, Kennedy mimed pointing his cell phone at the RV parking lot owner as though firing a gun. The RV park owner then called 911, reporting that Kennedy had attempted to shoot him.

At about 1:41 PM, Kennedy was parked in the Alien Travel Center parking lot, across the highway from the RV park. At that time, Nye County Deputy Nelson ("Nelson") and Bureau of Land Management Officer Ryan Gallagher arrived at the Alien Travel Center parking lot. Nelson asked Kennedy to step out of his vehicle, and began questioning Kennedy regarding the incident with the RV park owner. After Officer Gallagher completed a protective search of the driver's side of Kennedy's vehicle, Nelson and Officer Gallagher sat Kennedy on a bench in front of the Alien Travel Center and continued to question him. Kennedy stated that he was on his way to Oregon.

Between 1:41 PM and 2:25 PM, additional law enforcement officers arrived on the scene, including Nye County Detective Daniel Fischer ("Fischer") and his trainee Detective Brooke

---

117; Plaintiff's Motion for Summary Judgment, ECF No. 145 [hereinafter, "Ptf. MSJ"]; Defendants Breanna Nelson, Alan W. Schrimpf, Brooke Gentry, and Danel Fischer's Motion for Summary Judgment, ECF No. 146 [hereinafter, "Ofc. MSJ"]; Defendant Nye County's Moton for Summary Judgment at 4, ECF No. 147 [hereinafter, "Cnty. MSJ"] (adopting the statement of material facts set forth by the County Officers); and all attached exhibits.

Gentry ("Gentry"), Lieutenant Alan Schrimpf ("Schrimpf"), Michael Paul Mokeski, Trainee Isaac Champlin, and Nevada Highway Patrol Trooper Luke Stang.

At around 1:59 PM, Fischer and Gentry also arrived at the scene, but immediately went to the RV parking lot to interview the owner. Also at around 2:00 PM, Schrimpf arrived at the scene and began speaking with Kennedy, who told Schrimpf that he was going to Oregon. Detectives Fischer and Gentry then went to the RV parking lot to interview the owner.

The officers standing by Kennedy continue asking him for consent to search the vehicle. Nelson asks if Kennedy is worried about something else in the vehicle. Kennedy says there is "weed" in the car, but he does not want the officers to arrest him for smoking. Nelson tells Kennedy that weed is legal.

The officers eventually determined that Kennedy had not fired a weapon at the RV park owner, but rather, had brandished his cell phone as if it were a firearm.

At around 2:12 PM, Schrimpf tries again to obtain Kennedy's consent to search and states: "I'm going to try to get you out of here faster. . . . If I know there's no gun in that truck, it's gonna be a lot faster in getting you out of here. . . Unless you have a hundred pounds of marijuana and sh[-]t like that, I could give a sh[-]t."

Kennedy stated there was no gun in his truck and consented to the search. Subsequently, at around 2:13 PM, Nelson searched Kennedy's vehicle and discovered a piece of crumpled aluminum foil containing two pills. Schrimpf asks Nelson if there was "Nothing?" and Nelson replied, "No gun. Burnt foil, that's it." Schrimpf tells Nelson to grab the foil with her glove, and she pulls it out and hands it to Schrimpf.

While Nelson searches Kennedy's truck, Gentry and Fischer are talking to Kennedy on the bench. Fischer asks Kennedy to explain the altercation with the RV park owner, which Kennedy proceeds to do. Kennedy states that he is from Phoenix and is driving to Oregon, where he lives in the summer.

Fischer then discusses the vehicular search with Kennedy, and says to him: "Do you see why, if there's no guns in there [Kennedy's truck], then we can just wrap this up. . . . We're looking for guns, if you don't got a gun, then we don't give a sh[-]t. Is that fair?" Fischer instructs Kennedy

not to pretend to brandish a firearm and turns to leave. Gentry tells Kennedy: "Have a better day. Drive safe." Kennedy then asks: "Am I good to go?" Gentry responds: "Almost, just a few minutes."

Gentry and Fischer approach Kennedy's vehicle while Nelson and Schrimpf are discussing the burnt foil. Schrimpf says to the group that Kennedy is probably "chasing" pills. Fischer says to the group that Kennedy's eyes are pinpoint, and he's probably under the influence.

Gentry says to Nelson: "I don't care about pills. Um, tell him . . . It's up to you. It's not mandatory. So if you wanna tell him you're gonna f[-]cking toss it, and then toss it in the garbage, or do the report, and do the report."

Nelson then says to Gentry: "Sounds like garbage."

Gentry says to Nelson and Schrimpf: "[I]t's not a gun . . . .So just tell him not to do drugs. And don't point his phone at people like it's a gun." Gentry and Fischer turn to leave.

Schrimpf follows Gentry and Fischer to ask if the RV park owner wanted a report. Gentry says she does not think they need to, but they may want a report for trespass. Schrimpf says to Gentry: "He's going to Oregon, so I don't think we need to do that." Schrimpf walks back to Nelson, who is approaching Kennedy.

Nelson says to Kennedy: "Yeah bro, your pills are going in the trash. . . . Don't do drugs."

Kennedy responds to Nelson: "That's what I was worried about."

Nelson says to Kennedy: "That one pill is what you're worried about?"

Kennedy says to Nelson: "I, it's . . . I ha . . . I, I ha . . . I'm going to Oregon to go to rehab. I'm sick. I have to do that, or I'm going to get sick. It's not like I have . . . I'm not doing it cuz . . . I have to do it, or I'm going to be sick."

Nelson says: I mean, you don't have to do nothing." Kennedy responds: "I just don't want to be sick."

Schrimpf says to Kennedy: "Alright, well, that's your choice. Alright, so, did we learn anything today?" Schrimpf proceeds to discuss the dangers of pretending to brandish a firearm.

Nelson asks Schrimpf whether a report was wanted. Schrimpf says no, then to Kennedy, says: "You're going to Oregon, so I don't need to trespass you, right?"

Kennedy responds: "I'll get what I was coming here for, and I'll be on my way."

Nelson says to Kennedy: "Your keys are in the front seat of your car. . . . I think your phone's. . . on the front seat." Schrimpf looks in the vehicle and confirms that Kennedy's phone is in the car. As Schrimpf and Nelson are leaving, Nelson says that the entire encounter was a waste of time.

At about 2:35 PM, Kennedy drove out of the parking lot onto US-95. Nelson followed him for about 30 minutes on the interstate, before ultimately turning around.

After the crash, Gentry sent a text reading: "The dude that pat[r]ol let go and d[r]ive high as f[-]ck just killed 3 people including a f[-]cking child".

**ii. *Events Relating to the Officer Defendants' Discipline***

After the March 27, 2021, crash, Internal Affairs ("IA") Captain Harry Means conducted an investigation and found that Nelson, Schrimpf, Fischer, and Gentry had each violated Nye County Sheriff's Office Policies 0043 and 1000.

According to the original IA investigation, the Officer Defendants violated Policy 0043 when they disposed of the pills they found in the trash in front of Kennedy, rather than logging them as evidence. Policy 1000 provides that "[i]t is the policy of the Nye County Sheriff's Office patrol to protect and to provide quality emergency services to all persons within the county by actively seeking to identify and apprehend those person(s) responsible for committing violations of city, county, state and federal laws." Policy 1000, Ptf. MSJ, Ex. 17. Captain Means recommended that all Officer Defendants be terminated.

Undersheriff Eisenloffel, after reviewing Captain Means's investigation, sustained his findings and also recommended termination. Sheriff Wehrly instructed Undersheriff Eisenloffel to change his recommendation—specifically, to not sustain the Policy 1000 violation and to not recommend Officer Defendants be terminated.

**B. Disputed Facts**

The parties dispute the following facts:

Whether Kennedy was visibly smoking when Nelson first approached him; whether Kennedy showed visible, obvious signs of impairment during his encounter with Officer

Defendants; whether Officer Defendants were trained to detect drug impairment; whether Officer Defendants believed Kennedy was impaired during their encounter; whether a field sobriety test was suggested; whether Sheriff Wehrly's motivation in instructing Undersheriff Eisenloffel to change his recommendation was to ratify the Officer Defendants' conduct.

## III. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two, 249 F.3d 1132, 1134 (9th Cir. 2001). Overall, it is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. See Zetwick v. County of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986) (the inquiry for summary judgment is, essentially, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

## IV. DISCUSSION

For the reasons stated below, the Court denies summary judgment on all claims. The Court finds that there is a triable dispute of fact as to whether each Officer Defendant engaged in unconstitutional affirmative actions that encouraged or otherwise proximately caused Kennedy to drive out of the parking lot.

**A. SECTION 1983 CLAIMS**

To make out a *prima facie* case under 42 U.S.C. § 1983, a plaintiff must show that a defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right. See Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1989).

**1. Under Color of Law**

It is undisputed that the Officer Defendants were acting under color of law. See Ptf. MSJ at 21; Ofc. MSJ at 8; Cnty. Resp. to Ptf. MSJ at 16.

**2. Constitutional Rights Violation – Due Process**

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Plaintiffs' claims are rooted in the substantive component of the Due Process Clause. See Martinez v. City of Clovis, 943 F.3d 1260, 1270 (9th Cir. 2019) (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 194–95 (1989)); Wilkinson v. Torres, 610 F.3d 546, 554 (9th Cir. 2010) (citing Curnow ex rel. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991)). Specifically, Plaintiffs allege, on behalf of others, that Defendants violated their right to be free from state-created danger, and, on behalf of themselves, that Defendants violated their right to be free from interference with familial relations, though Defendants' creation of danger. See SAC at 15–17; 22–23; Sinclair v. City of Seattle, 61 F.4th 674, 679–80 (9th Cir. 2023). Thus, the Court turns to the elements of a state-created danger claim.

The Due Process Clause is a limitation on state action and is not a "guarantee of certain minimal levels of safety and security." DeShaney, 489 U.S. at 195. Simply failing to prevent acts of a private party is insufficient to establish liability. See Patel v. Kent Sch. Dist., 648 F.3d 965, 971 (9th Cir. 2011). "The general rule is that a state is not liable for its omissions . . . . As a corollary, the Fourteenth Amendment typically does not impose a duty on the state to protect

individuals from third parties." Id. (internal quotations marks, citations, and alterations omitted).

There are two exceptions to this general rule. First, a special relationship between the plaintiff and the state may give rise to a constitutional duty to protect. See DeShaney, 489 U.S. at 198–202. Second, a state's omission or failure to protect may give rise to a Section 1983 claim "when the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known or obvious danger' (the state-created danger exception)[.]" Patel, 648 F.3d at 971–72 (quoting L.W. v. Grubbs, 92 F.3d 894, 900 (9th Cir.1996)).

Plaintiffs' claims arise under the second theory. Thus, Plaintiffs must show that Defendants (1) took affirmative actions that exposed Plaintiffs to a danger that they would not otherwise have faced; and that (2) the danger was actual and particularized; (3) the injuries Plaintiffs suffered were foreseeable; (4) the officers were deliberately indifferent to the known danger. See Martinez, 943 F.3d at 1271 (citing Hernandez v. City of San Jose, 897 F.3d 1125, 1133 (9th Cir. 2018)).

As explained below, the Court finds summary judgment is not warranted for the Section 1983 Claims because there is a genuine dispute of material fact as to whether each Officer Defendants took affirmative actions that exposed Plaintiffs to a danger they would not have otherwise faced. More specifically, the Court finds that the parties genuinely dispute the material fact of whether each Officer Defendant—through their respective words and actions—encouraged, and thus caused, Kennedy to drive out of the parking lot.

#### *i. Affirmative Actions that Exposed Plaintiffs to a Danger They Would Not Otherwise Have Faced*

In the Ninth Circuit, mere inaction or negligence does not constitute a colorable due process violation under Section 1983. This is true both because a *failure to act* does not constitute "affirmative" action, nor does it create danger that claimants otherwise would not have faced. Rather, when assessing a state-created danger claim, the Court must "examine whether the officers left the person in a situation that was more dangerous than the one in which they found him." Murguia v. Langdon, 61 F.4th 1096, 1111 (9th Cir. 2023) (quoting Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000)); Hunters Cap., LLC v. City of Seattle, 650 F. Supp. 3d 1187, 1202 (W.D. Wash. 2023) (characterizing the framework of a typical state-created

danger case as "where state actors select a bad option despite the availability of better alternatives"). "The critical distinction is not . . . an indeterminate line between danger creation and enhancement, but rather the stark one between state action and inaction in placing an individual at risk." Id. (quoting Penilla v. City of Huntington Park, 115 F.3d 707, 710 (9th Cir. 1997)). Other courts have framed this question as one of causation. See Wright v. Shumate, 181 F.4th 742, 749 (7th Cir. 2026) ("If the state does create or increase a danger, its action or failure to act must be both the actual and proximate cause of the harm."); Henry v. City of Erie, 728 F.3d 275, 285 (3d Cir. 2013) (claimants alleging state-created danger "must plausibly allege that state officials' actions precipitated or were the catalyst for the harm for which the plaintiff brings suit.") (internal quotation marks, citations, and alterations omitted); Est. of Sanchez v. City of Saginaw, 678 F. Supp. 3d 888, 904 (E.D. Mich. 2023) ("Simply put, in a state-created-danger case, there is only one proximate cause at issue.").

Accordingly, verbal instructions or comments may constitute affirmative actions if they caused or created increased danger for claimants. For example, an officer's failure to arrest, combined with "positive remarks[,]" may communicate to an individual that they can continue illicit behavior with impunity. Martinez, 943 F.3d at 1277 (9th Cir. 2019). See also Murguia, 61 F.4th at 1116 (framing Martinez as a situation "where the officer provided the abuser with information that may have changed his course of action"). Thus, for the purposes of a state-created danger claim, encouragement to engage in illicit activity constitutes affirmative action, if the encouraged individual would not have otherwise engaged in that illicit activity.

Furthermore, liability under Section 1983 requires a level of participation in the alleged unconstitutional action. "[P]ersonal participation is not the only predicate for section 1983 liability. Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." Johnson v. Duffy, 588 F.2d 740, 743–44 (9th Cir. 1978) (citation omitted).

After considering the evidentiary material set forth by both parties, the Court finds that

neither party is entitled to summary judgment. It is undisputed that each Officer Defendant had the independent authority to arrest and/or detain Kennedy for impaired driving, but chose not to do so, despite departmental policy. See generally IA Report, Ptf. MSJ, Ex. 21 (citing Policy 1000, Policy 0068, and INV 0006)[2]. Defendants' choice not to prevent Kennedy from driving out of a range of possible alternatives, combined with their words, could constitute a state-created danger. Indeed, in his deposition, Kennedy states that he felt "pressured" to leave by the totality of the Officer Defendants' conduct. See Deposition of Tyler Kennedy at 45, Ptf. MSJ, Ex. 1; Ofc. MSJ, Ex. I. Thus, for Plaintiffs to satisfy the elements of a state-created danger claim, it must be decided whether Kennedy would have driven impaired on the highway, if not for each Officer Defendant's words and/or decision not to arrest. Unless the evidence is "so one-sided that one party must prevail as a matter of law[,]" that question is ultimately for a jury to resolve. Anderson, 477 U.S. at 252.

The Court addresses whether, on this record, it can find as a matter of law that each Officer Defendant affirmatively acted by encouraging Kennedy to drive impaired. See Murguia, 61 F.4th at 1112.

*a. Lieutenant Schrimpf*

As stated above, it is undisputed that the following interactions between Schrimpf and Kennedy took place:[3]

Schrimpf was the highest-ranking official on the scene. Schrimpf had independent authority to arrest and/or detain Kennedy. In attempting to obtain Kennedy's consent to search his vehicle, Schrimpf informed Kennedy that the officers would not care unless they found a firearm or a hundred pounds of marijuana in his vehicle. After Nelson searched the car and informed Schrimpf that there was burnt foil in the car, Schrimpf told the other Officer Defendants that Kennedy was chasing pills.

---

[2] Policy 1000, "Standard Operating Procedure," requires Nye County deputies "to use knowledge concerning the law, training, common sense, and reasonableness as to the action taken." Ptf. MSJ, Ex. 17. Policy 0068, "Code of Professional Conduct," states that "[t]he administrative delegation of the enforcement of specialized laws and ordinances to particular units of the Department does not relieve members of other units from the responsibility for taking prompt, effective police action to enforce those laws when the occasion arises." IA Report at NYE007601, Ptf. MSJ, Ex. 21. INV 0006, "Assistance," reads: "An investigator shall never refuse to provide assistance or expertise to on-scene patrol staff even if the offence is not a Major Offense." Id.

[3] The following interactions are drawn from Schrimpf's body-worn camera video and deposition testimony. See Schrimpf BWC, Ptf. MSJ, Ex. 31; Ofc. MSJ, Ex. D; Schrimpf Deposition, Ptf. MSJ, Ex. 7; Ofc. MSJ, Ex. G.

Schrimpf then listens to Nelson tell Kennedy that she is throwing away his pills. Kennedy tells Nelson and Schrimpf that he was going to rehab in Oregon, and has to do drugs to not be sick. Schrimpf tells Kennedy that is "his choice" and proceeds to warn Kennedy about the dangers of pretending to brandish a firearm.

Schrimpf asks Gentry and Fischer whether the RV park owner would like a report, and they reply that Schrimpf may choose to file a trespass report. Schrimpf tells Gentry and Fischer that he believes a trespass report is not necessary, as Kennedy is going to Oregon. Schrimpf checks with Kennedy, asking: "You're going to Oregon, so I don't need to trespass you, right?" Kennedy then shakes his head and says to Schrimpf, "I'll just get what I was coming here for and then I'll be on my way." Schrimpf says to Kennedy: "Alright. Okay."

Plaintiff asks the Court to construe these facts as Schrimpf commanding Kennedy to go onto the road with the threat of a trespass citation—*i.e.*, affirmative actions that caused Kennedy to drive, though he may not otherwise have. On the other hand, Defendants ask the Court to construe these facts as Schrimpf choosing not to detain or otherwise take any action against Kennedy, and Kennedy, who was already impaired and had a history of driving while impaired, would have gotten into the car crash anyway—*i.e.*, inaction.

The Court finds a genuine dispute over whether Schrimpf's words and actions constituted encouragement. Schrimpf could be liable for "encouraging" Kennedy under two theories: if his words and actions, standing alone, caused Kennedy to drive when he otherwise would not have, Schrimpf is liable. As the highest-ranking officer on the scene, if Schrimpf's words and actions—particularly, his acknowledgement that Kennedy had done drugs, accompanied by his decision to let Kennedy immediately drive to Oregon—set in motion a series of acts by the other Officer Defendants which Schrimpf knew or reasonably should have known would have encouraged Kennedy to drive, he is liable. Alternatively, if a jury found that, had Schrimpf not even arrived on the scene or been present, Kennedy would have driven impaired anyway, Schrimpf would not be liable.

In sum, the Court finds that, as a legal matter, encouragement would constitute a due process violation for the purposes of a Section 1983 claim, but whether Schrimpf personally

engaged in such a violation is a triable question of fact. Summary judgment for Defendant Schrimpf is denied.

*ii. Officer Nelson*

Similarly, the Court finds that summary judgment for Nelson is not warranted because it is disputed whether her actions and words encouraged Kennedy to drive.

As stated above, it is undisputed that the following interactions between Nelson and Kennedy took place:[4]

Deputy Nelson had the independent authority to arrest and/or detain Kennedy. Nelson was the first to arrive on the scene. Kennedy told Nelson that he was on a road trip to Arizona to check himself into rehab. Nelson searched Kennedy's truck and found burnt foil, which she seized at Schrimpf's direction. Nelson finished searching the truck and did not confiscate anything else.

Nelson has a conversation with Gentry, where Gentry tells Nelson that it is up to her whether to arrest Kennedy for drug possession. Gentry tells Nelson that it is not mandatory to do so, and that Nelson can either tell Kennedy that she is tossing his drugs in the garbage or write up the report.

After this conversation, Nelson approaches Kennedy and tells him: "Yeah bro, your pills are going in the trash. Don't do drugs." Kennedy tells Nelson that the pills were what he was worried about, when he previously declined to consent to a vehicular search. Nelson responds: "That one pill is what you're worried about?" Kennedy then tells Nelson that he is going to Oregon to go to rehab, and that he has to "do that" or he's going to be sick. Nelson says: "I mean, you don't have to do nothing."

Nelson then asks Schrimpf if the RV park owner wanted a report, and Schrimpf responded that he did not. Nelson says to Kennedy: "Yeah, your keys are on the front seat of your car. . . Your phone is there, too."

Nelson remained in the parking lot. After Kennedy pulled out of the parking lot, Nelson followed him for about 30 minutes on the highway.

Plaintiffs ask the Court to construe these facts—particularly Nelson's conversation with

[4] The following interactions are drawn from Nelson's body-worn camera video. See Nelson BWC, Ptf. MSJ, Ex. 30; Ofc. MSJ, Ex. A.

Kennedy about pills, Nelson's pointing to the keys, and Nelson's following of Kennedy—as Nelson encouraging or pressuring Kennedy to drive, though he may not otherwise have. Defendants ask the Court to construe these facts as Nelson's inaction in choosing not to arrest Kennedy.

As above, the Court finds that neither party is entitled to summary judgment. From Kennedy's point of view, Nelson found evidence of drug use, knew that Kennedy was going to Oregon, and chose not to arrest him. Further, Nelson affirmed that Kennedy's keys were in his car, indicating her knowledge of the possibility that he would drive. A jury could find that these actions communicated to Kennedy that he could drive impaired with impunity. Yet, it is plausible that, after following Kennedy, Nelson believed that his driving did not pose a risk. Ultimately, however, the Court finds these questions to be for the jury. The parties genuinely dispute whether Nelson's actions and words constituted encouragement. Summary judgment for Defendant Nelson is denied.

*iii. Detective Gentry*

The Court finds that there is a genuine issue of disputed fact as to whether Gentry's words and actions encouraged Kennedy to drive. It is undisputed that the following interactions between Gentry, Kennedy, and the other Officer Defendants took place:[5]

Gentry and Fischer, Nye County detectives, responded to the scene in response to a 911 call about a potential shooting. Detective Gentry had the independent authority to arrest and/or detain Kennedy. When they first arrived, the detectives interviewed the 911 caller, an RV park owner. Afterwards, Gentry and Fischer had a conversation with Kennedy, in which Fischer told Kennedy that the detective did not care unless Kennedy had a gun. Fischer tells Kennedy not to pretend to brandish a firearm, and when the detectives turn to leave, Gentry says to Kennedy: "Have a better day. Drive safe." Kennedy then asks: "Am I good to go?" Gentry responds: "Almost, just a few minutes."

Gentry and Fischer approach Kennedy's vehicle while Nelson and Schrimpf are discussing the burnt foil found in Kennedy's vehicle. Gentry says to Nelson: "I don't care about pills. Um, tell him . . . It's up to you. It's not mandatory. So if you wanna tell him you're gonna f[-]cking toss

[5] The following interactions are drawn from Gentry's body-worn camera video. See Gentry BWC, Ptf. MSJ, Ex. 32; Ofc. MSJ, Ex. C.

it, and then toss it in the garbage, or do the report, and do the report. . . . "[I]t's not a gun . . . . So just tell him not to do drugs. And don't point his phone at people like it's a gun."

When Schrimpf asks Gentry whether the RV park owner wanted a report, Gentry replies that the RV park owner did not want a report but may want Kennedy trespassed. When Schrimpf tells Gentry that Kennedy is going to Oregon, Gentry responds: "Alright, cool."

Plaintiffs ask the Court to construe Gentry's statements to Kennedy—particularly to "drive safe"—as an encouragement to drive. Defendants ask the Court to construe Gentry's overall conduct to simply be a decision not to arrest Kennedy. Rather, Gentry specifically instructed Nelson to tell Kennedy not to do drugs.

Again, the Court finds genuine issues of disputed fact as to Gentry. It is, and should be, left to a factfinder to determine whether Gentry's conduct constitutes *inaction*, that would not create liability, or *encouragement* to drive, which would create liability. It is undisputed that Gentry made a remark to Kennedy to "drive safe," and specifically instructed Nelson that she could throw away the pills. In this way, construing facts in favor of Plaintiffs, Gentry's decision not to arrest informs the manner in which Gentry's positive remarks communicate that the individual may continue their course of action with impunity. See Martinez, 943 F.3d at 1277. Further, if Gentry's comments to Nelson set in motion a series of actions by *Nelson*, that Gentry should have known would encourage Kennedy to drive, Gentry could be liable on that basis. Thus, the Court finds that it is a question for the jury to decide whether Gentry's words and actions encouraged Kennedy to drive or set in motion a series of actions that encouraged Kennedy to drive. Summary judgment is denied as to Gentry.

*iv. Detective Fischer*

The Court finds that there is a genuine issue of disputed fact as to whether Fischer's words and actions encouraged Kennedy to drive. It is undisputed that the following interactions between Fischer, Kennedy, and the other Officer Defendants took place:[6]

On March 27, 2021, Fischer was training Gentry. Detective Fischer had the independent authority to arrest and/or detain Kennedy. When Fischer and Gentry first arrived at the scene, they

[6] The following interactions are drawn from Fischer's body-worn camera video. See Fischer BWC, Ptf. MSJ, Ex. 33; Ofc. MSJ, Ex. B.

interviewed the RV park owner. Then, Fischer and Gentry speak with Kennedy. During that conversation, Kennedy tells Fischer that he is driving to Oregon.

Fischer then discusses the vehicular search with Kennedy, and says to him: "Do you see why, if there's no guns in there [Kennedy's truck], then we can just wrap this up. . . . We're looking for guns, if you don't got a gun, then we don't give a shit. Is that fair?" Fischer instructs Kennedy not to pretend to brandish a firearm and turns to leave.

After this encounter, Fischer tells the other Officer Defendants that: "His [Kennedy's] eyes are pinpoint" and that Kennedy is "probably under the influence." Fischer stands by while Gentry tells Schrimpf that no report is necessary.

The Court finds that there is a genuine dispute of fact as to whether Fischer—who believed there was a risk that Kennedy was under the influence and knew he was driving to Oregon—encouraged Kennedy to drive by through his decision not to arrest Kennedy. In other words, a reasonable juror could find that Fischer's remarks to Kennedy about wrapping up the encounter, combined with his decision not to arrest Kennedy, communicated to Kennedy that he may drive impaired without impunity. Further, as Fischer was training Gentry, he could also be liable if a jury found that his affirmative actions set in motion a series of acts by the other Officer Defendants that encouraged Kenedy to drive. Thus, summary judgment for Fischer is denied.

***ii. Actual and Particularized Danger***

To support a state-created danger claim, the alleged danger must be actual and particularized. See Martinez, 943 F.3d at 1271. It is beyond dispute that the danger posed by an impaired motorist is actual. A danger can be particularized even if it is directed toward a "discrete and identifiable group[.]" Polanco v. Diaz, 76 F.4th 918, 927 (9th Cir. 2023) (quoting Sinclair v. City of Seattle, 61 F.4th 674, 676, 683 (9th Cir. 2023)).

While the Ninth Circuit has never been presented with similar facts and held that an impaired driver poses a particularized danger, its reasoning and analysis in Sinclair v. City of Seattle suggest that an impaired driver clearly represents such a danger. 61 F.4th at 683–84. In Sinclair, the Ninth Circuit found that, the public officials' creation of "uncontrolled lawlessness" did not translate into particularized danger to known and identifiable victims. However, the

Sinclair court used an impaired driver as a counterpoint to illustrate how state actors *could* create a particularized danger, explicitly reasoning that the injury in Sinclair should be contrasted with a "drunk-driving victim's injuries" which are "directly or necessarily correlated to the . . . danger of letting an intoxicated person get behind the wheel." Id. at 684. In so doing, the Ninth Circuit cited, for further explication and affirmation of this point, the Seventh Circuit's decision in Reed v. Gardner, 986 F.2d 1122, 1127 (7th Cir. 1993). In Reed, the Seventh Circuit also explicitly stated that an impaired driver satisfied the state-created danger doctrine because "the other motorists" in the area were "worse off with a drunk driver heading toward them than a sober one." Id. at 1125, 1127. The Reed court thus concluded that the danger posed by a drunk driver is particularized because "[t]he dangers presented by drunk drivers are familiar and specific; in addition, the immediate threat of harm has a limited range and duration." Id. at 112. Therefore, the Ninth Circuit in Sinclair, citing the Seventh Circuit in Reed, has clearly indicated that impaired drivers could pose a particularized danger, because their potential victims may not be known but are clearly identifiable.

Based upon the reasoning and holding of the aforementioned case law, the Court finds that Plaintiffs have alleged a particularized harm sufficient to support a Section 1983 claim. First, Plaintiffs have named a discrete and identifiable group: southbound motorists on US-95. Officer Defendants do not contest the identification of this group within the scope of harm, but rather claim that a danger "generalized to all members of the public who happened to be traveling on the same highway at the same time as Kennedy" does not satisfy the "particularized" standard. However, it is undisputed that all Officer Defendants were aware that Kennedy was going to Oregon—indeed, Nelson followed Kennedy onto the interstate—and that US-95, a two-lane highway, is the only interstate connecting Nye County to Oregon. They also knew that he would be driving immediately.

As such, the Court need not find, as a general matter, that danger posed by impaired motorists always constitutes a particularized harm. Instead, the Court finds that, in this case, the danger posed by Kennedy, who informed the Officer Defendants that he would be traveling to a different state two hours away, which can only be accessed by a two-lane highway, was sufficiently

"specific," "immediate," and of a "limited range" and "duration." See Sinclair, 61 F.4th at 684.

***iii. Foreseeable Injuries***

The next element of a state-created danger claim, is that "the ultimate injury to the plaintiffs must be foreseeable." See Hernandez, 897 F.3d at 1133 (citing Lawrence v. United States, 340 F.3d 952, 957 (9th Cir. 2003)). "This does not mean that the exact injury must be foreseeable. Rather, the state actor is liable for creating the foreseeable danger of injury given the particular circumstances." Martinez, 943 F.3d at 1273–74 (internal quotation marks and citations omitted).

Here, as a matter of common sense, and as admitted by Defendants, it is objectively foreseeable that an intoxicated person would get into a crash when driving across multiple state lines. See id. at 1274.

However, for the same reasons that the Court finds there to be a question of fact as to whether Defendants' words and actions encouraged Kennedy, the Court finds there to be a factual dispute as to whether each Defendant foresaw that their words and actions would cause Kennedy to drive impaired "given the particular circumstances." Id.

***iv. Deliberate Indifference to Known Danger***

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997). The standard for deliberate indifference is higher than gross negligence, and "requires a culpable mental state." Patel, 648 F.3d at 974 (citing Grubbs, 92 F.3d at 898–900). "In other words, the defendant knows that something *is* going to happen but ignores the risk and exposes the plaintiff to it. The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." Id. (internal quotation marks, citations, and alterations omitted) (emphasis in original).

Plaintiffs request that the Court find that Officer Defendants meet the high standard of deliberate indifference. Defendants request the Court find that Defendants lacked any knowledge whatsoever of any risk that Kennedy was impaired. The Court declines to reach so far; it is clear from the record that each Defendant *suspected*, at the least, that Kennedy was presently impaired.

As it pertains to ignorance of risk, the following facts are undisputed:

The Officer Defendants all knew there was evidence of drug use in Kennedy's vehicle and thus knew of the risk that Kennedy was a drug user. Schrimpf stated that Kennedy was a drug user, chasing pills. Fischer agreed with Schrimpf, observing that Kennedy's eyes were pinpoint and that he was "probably under the influence." Nelson and Gentry agreed to tell Kennedy not to do drugs, implying that he was or would have done drugs. Gentry would later write and send a text message stating, "The dude that pat[r]ol let go and d[r]ive high as f[--]k just killed 3 peoiple including a f[--]king child[.]" Each Officer Defendant also knew that Kennedy was traveling to Oregon.

In sum, Officer Defendants knew Kennedy was a drug user, that there were drugs in his car, that he was likely under the influence of drugs, and that he was driving across state lines. Thus, on the record before it, Court concludes that any reasonable jurist could find that each Officer Defendant was deliberately indifferent. Notably, the standard for deliberate indifference does not require actual knowledge of fact, but rather knowledge of a risk. If the Officer Defendants each recognized there was a *risk* that Kennedy would drive impaired after their encounter—even if they did not know for a fact if Kennedy was presently impaired—and chose to ignore that unreasonable risk, they can be found to be deliberately indifferent. The Court need not find that the Defendant Officers knew, without a doubt, that Kennedy was intoxicated. Rather, the Court need only find that there are undisputed or disputed facts indicating that Defendant Officers knew of a risk that Kennedy was intoxicated, and would thus be a dangerous motorist, yet deliberately disregarded that risk. As such, the Court finds that there is a triable issue as to whether, given the information available to each Officer Defendant and the evidence of their post-encounter behavior, each Officer Defendant knew of, and deliberately ignored the *risk* that Kennedy would drive impaired.

**B. INTERFERENCE WITH FAMILIAL RELATIONSHIPS**

Defendants move for summary judgment on Plaintiffs' interference with familial relations claims arising under Section 1983. In the Ninth Circuit, it has long been recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children. Wilkinson, 610 F.3d at 554. Official conduct that "shocks the conscience" in depriving parents of that interest is cognizable as a violation of due process, and where actual deliberation is practical, then an officer's deliberate indifference may suffice to shock the conscience. Id.

Here, it is clear that Officer Defendants had time to actually deliberate how they would interact with Kennedy, and the deliberate indifference standard applies. For the same reasons stated above, *supra*, Part IV.A.2.iv., whether each Officer Defendant had a sufficiently culpable mental state rising to the level of deliberate indifference is a triable question of fact for the jury. Defendants have not met their burden and are not entitled to summary judgment on this claim.

**C. Qualified Immunity**

The Court turns to the doctrine of qualified immunity as it applies to the Officer Defendants. The Court denies Officer Defendants summary judgment on qualified immunity. The facts taken in a light most favorable to the Plaintiffs demonstrate a constitutional violation of clearly established law. Alternatively, qualified immunity is improper at this stage because there are triable issues of fact regarding the alleged violation.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Reese v. Cty. of Sacramento, 888 F.3d 1030, 1037 (9th Cir. 2018) (quoting Pearson v. Callahan, 555 U.S. 223 (2009)). In evaluating whether an officer is entitled to qualified immunity, courts consider (1) whether the facts that a plaintiff has alleged make out a violation of a constitutional right, and (2) whether that right was clearly established at the time of the incident. See Wilkinson, 610 F.3d at 550 (citing Pearson, 555 U.S. at 223)). Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. In deciding a claim of qualified immunity where a genuine dispute of material fact exists, the court accepts the version asserted by the non-moving party. See Bryan v. MacPherson, 630 F.3d 805, 823 (9th Cir. 2010).

Importantly, district courts may not grant qualified immunity where its determination depends upon genuine issues of disputed fact. Summary judgment is inappropriate where genuine disputes of material fact prevent a determination of qualified immunity. See Bonivert v. City of Clarkston, 883 F.3d 865, 872 (9th Cir. 2018).

Both parties move for summary judgment on qualified immunity—Plaintiffs seek a finding

that the Officer Defendants are not entitled to qualified immunity, and Officer Defendants seek a finding of immunity.

Considering first Officer Defendants' motion, the Court finds that, assuming the facts most favorable to the Plaintiffs, the Officer Defendants' conduct could establish a due process violation under the state-created danger doctrine and that such a violation would be of clearly established law. "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Zorn v. Linton, 607 U.S. 568, 571–72 (2026). At the time of the incident in this case, it was "clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger she would not otherwise have faced." Kennedy v. City of Ridgefield, 439 F.3d 1055, 1066 (9th Cir. 2006). See also Martinez (holding it clearly established that the state-created danger doctrine applies when an officer makes comments that "reasonably emboldens the abuser to continue abusing the victim with impunity"); Hernandez, 897 F.3d at 1138 (finding "affirmative conduct akin to directing someone involuntarily into dangerous conditions" was a violation of the state-created danger doctrine) (quoting Johnson v. City of Seattle, 474 F.3d 634 (9th Cir. 2007)). Next, considering Plaintiffs' motion, the Court finds that, because there exists a genuine dispute of material fact regarding the alleged rights violation, it is inappropriate at this time for the Court to grant Plaintiffs summary judgment on liability and qualified immunity.

The Court thus denies qualified immunity on two grounds. First, assuming facts most favorable to the Plaintiffs, the conduct of the officers was a clearly established violation of law. Plaintiffs argue that Defendants knew Kennedy was impaired by drugs. They knew he might have more drugs in the car and would likely be taking more drugs while he was driving. They knew of the risks of extreme harm and lethal danger to other drivers on the road posed by Kennedy. Knowing these facts, the officers nonetheless deliberately encouraged him to drive, leading to the deaths of two adults and one minor child. Such conduct was a clearly established violation of the law. Hernandez, 897 F.3d at 1138. Second, the Court also finds that summary judgment on qualified immunity must be denied because there are genuine issues of disputed fact central to the determination of whether a constitutional violation occurred. Summary judgment is inappropriate

where genuine disputes of material fact at the heart of the violation inquiry prevent a determination of qualified immunity. Bonivert, 883 F.3d at 872. Summary judgment on qualified immunity is denied as to both parties.

**3. Monell Liability**

A municipal entity may also be sued under Section 1983 for "their own illegal acts." Connick v. Thompson, 563 U.S. 51, 60 (2011). "They are not vicariously liable under § 1983 for their employees' actions." Id. Under Monell, when a municipal policy of some nature is the "driving force" behind an unconstitutional action taken by municipal employees, the municipality will be liable. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). Further, under Monell, a plaintiff can recover based on three different theories: commission, omission, or ratification. Clouthier v. County of Contra Costa, 591 F.3d 1232, 1249–50 (9th Cir. 2010). As relevant here, Plaintiffs allege Nye Couty is liable under the omission theory—*i.e.*, failure to train—and/or the ratification theory—*i.e.*, purposeful approval of an employee's unconstitutional conduct. See id.; Roberts v. Nye Cnty., No. 222CV00398RFBEJY, 2024 WL 1380626, at *9 (D. Nev. Mar. 31, 2024). County Defendants have moved for summary judgment on the failure-to-train theory. Both County Defendants and Plaintiffs have moved for summary judgment on the ratification theory. The Court addresses each theory in turn.

Under the omission theory of Monell liability, a municipality is liable for their failure to train "only where it reflects a deliberate indifference to the constitutional rights of its inhabitants." City of Canton v. Harris, 489 U.S. 378, 392 (1989). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011) (internal quotation marks and citations omitted). "[I]n rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality[.]" Benavidez v. Cnty. of San Diego, 993 F.3d 1134, 1153 (9th Cir. 2021) (internal citation omitted). Liability can be attributed to the municipality if "the deficiency in training actually caused the police officers' indifference . . . Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" Harris,

489 U.S. at 391 (1989).

Plaintiffs allege that Sheriff Wehrly was on notice that there were deficiencies in impaired-driving training for police officers yet chose to ignore it. Defendants, in response, point out that Plaintiffs have not provided evidence of any other similar alleged constitutional violations committed by officers of the Nye County Sheriff's Office, much less a pattern of such alleged constitutional violations.

Making all reasonable inferences in favor of Plaintiffs, the Court finds that summary judgment for Defendants is not warranted. In particular, the Court finds that there are triable issues of fact as to whether Sheriff had actual or constructive notice of continued tortious conduct. Plaintiffs proffer evidence that Sheriff Wehrly was aware of (1) a fentanyl epidemic; (2) "bad" policies and procedures; and (3) officers "who are not doing what the policies and procedures tell them to do." Ptf. Resp. to Cnty. MSJ at 24. In particular, Plaintiffs have offered evidence that, often officers are field trained to throw away small amounts of drugs and simply instruct the user to leave the county. See Deposition of Adam Levine at 52–58, Ptf. Resp. to Cnty. MSJ, Ex. 36. Additionally, because "post-event" evidence can be considered, Sheriff Wehrly's overturning of the disciplinary decision in this case could demonstrate the existence of a broader municipal policy or custom of permitting officers to disobey protocol. See Henry v. Cnty. of Shasta, 132 F.3d 512, 518–19 (9th Cir. 1997), as amended in 137 F.3d 1372 (9th Cir. 1998). Taken together, a reasonable juror could infer from these facts that Sheriff Wehrly knew of and was deliberately indifferent to the specific risk that, instead of detaining impaired drivers, officers would affirmatively encourage them to drive away. Thus, County Defendants are not entitled to summary judgment on the failure-to-train theory of Monell liability.

Next, to plead a claim under ratification theory, Plaintiffs must show that a final policymaker ratified a subordinate's actions. See Lytle v. Carl, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's decision and the basis for it. The policymaker must have knowledge of the constitutional violation and actually approve of it." Id. (internal quotation marks and citations omitted). The mere failure to discipline officers, without more, does not amount to ratification.

See Sheehan v. City & Cnty. of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014), overruled on other grounds by City & Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015). Rather, policymakers must make "a deliberate choice to endorse" the officers' actions. Gillette v. Delmore, 979 F.2d 1342, 1348 (9th Cir.1992).

Assuming that Sheriff Wehrly is a final policymaker, see Cnty. MSJ at 10, the Court finds that summary judgment is not warranted. Sheriff Wehrly's decision to overturn a disciplinary recommendation indicates that Sheriff Wehrly reviewed bases for the recommendation and made a deliberate choice to endorse the conduct. However, ratification requires knowledge that the underlying conduct is unconstitutional. The parties dispute both whether the underlying conduct was unconstitutional, and further, whether Sheriff Wehrly, in overturning the disciplinary recommendation, knew that the underlying conduct was unconstitutional. As explained above, the Court finds that a genuine issue of material fact exists as to whether a constitutional rights violation occurred, that is, whether the Officer Defendants' conduct rises to the level of encouragement. Thus, a jury must decide this question and further decide whether Sheriff Wehrly knew Officer Defendants' conduct was unconstitutional when deciding to overturn the disciplinary recommendation. Summary judgment on the ratification theory of Monell liability is denied.

### D. Tort Claims

Plaintiff brings multiple tort claims. For the same reasons that Court denies summary judgment for the Section 1983 claims, it also denies summary judgment on the tort claims.

#### 1. Negligence

Under Nevada law, a negligence claim has four elements: duty, breach, causation, damages. See Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc., 125 Nev. 818, 824, 221 P.3d 1276, 1280 (Nev. 2009). The Supreme Court of Nevada is "reluctant to affirm summary judgment in negligence cases because, generally, the question of whether a defendant was negligent in a particular situation is a question of fact for the jury to resolve." Butler ex rel. Biller v. Bayer, 123 Nev. 450, 168 P.3d 1055, 1063 (Nev. 2007); see also Rodriguez v. Primadonna Co., LLC, 125 Nev. 578, 584, 216 P.3d 793, 798 (Nev. 2009). However, whether the defendant owes a duty of care is a question of law that may be resolved on a motion for summary judgment. See Sparks v.

Alpha Tau Omega Fraternity, Inc., 127 Nev. 287, 296, 255 P.3d 238, 244 (Nev. 2011). Both parties have moved for summary judgment on duty, breach, and causation. The Court addresses each element.

**2. Duty and Breach**

Generally, "state officials have a duty to exercise ordinary care in performing their duties." Butler ex rel. Biller, 168 P.3d at 1065. However, fire and police departments do not have a duty to protect the public at large. Coty v. Washoe Cnty., 108 Nev. 757, 839 P.2d 97, 99 (Nev. 1992). There are two exceptions to the public duty doctrine: (1) where a public agent, acting within the scope of official conduct, assumes a special duty by creating specific reliance on the part of certain individuals; or (2) where a public officer's conduct affirmatively causes harm to an individual. See id. (citing Frye v. Clark Cnty., 637 P.2d 1215 (Nev. 1981); Nev. Rev. Stat. § 41.0336).

Plaintiffs' theory of duty proceeds under the latter exception—that is, affirmative conduct. As explained above, *supra*, Part IV.A.2.i., whether each Officer Defendant's actions affirmatively caused harm is a triable question of fact. If a jury found that each Officer Defendant encouraged Kennedy to drive, that would further constitute a breach of the officers' duty of due care. Contra Coty, 108 Nev. at 761, 839 P.2d at 99 (finding no actionable negligence claim where the deputy "did not instruct" an intoxicated driver "to continue driving"). Neither party is entitled to summary judgment on the issue of duty or breach.

**3. Causation**

Both parties have moved for summary judgment on the issue of causation. "In Nevada, issues of negligence and proximate cause are considered issues of fact and not of law, and thus they are for the jury to resolve." Brascia v. Johnson, 105 Nev. 592, 595, 781 P.2d 765, 767–68 (Nev. 1989) (internal quotation marks and citations omitted. See also Yamaha Motor Co., U.S.A. v. Arnoult, 114 Nev. 233, 238, 955 P.2d 661, 665 (Nev. 1998); Scialabba v. Brandise Const. Co., 112 Nev. 965, 970–71, 921 P.2d 928, 931 (Nev. 1996).

Here, the issue of causation is necessarily intertwined with the question of duty. Without a jury's determination as to whether each Officer Defendant affirmatively encouraged Kennedy to drive, the Court cannot determine whether that affirmative encouragement was the actual or

proximate cause of the harm. Because there exists a genuine dispute of material fact as to whether the Officer Defendants' conduct caused a harm that otherwise would not have existed, see *supra*, Part IV.A.2.i, the issue of causation is for a jury to decide. See Est. of Sanchez, 678 F. Supp. 3d at 904 (where there are many competing proximate causes, "the jury must balance the competing evidence to determine whether Defendants were the sole proximate cause"). Summary judgment is denied on the issue of causation.

**4. Gross Negligence**

Defendants move for summary judgment on Plaintiff's gross negligence claims. "A claim for gross negligence claim is separate from a normal negligence claim. To state a claim for gross negligence a plaintiff must establish that the defendant failed to exercise even the slightest degree of care in his conduct." Underwood v. O'Reilly Auto Parts, Inc., 671 F. Supp. 3d 1180, 1189 (D. Nev. 2023) (internal quotation marks, citations, and alterations omitted). Generally, the degree of inattention is a question of fact to be decided by a jury. See Fargo v. City of San Juan Bautista, 857 F.2d 638, 641 (9th Cir. 1988) ("When reasonable persons may disagree as to whether particular conduct constitutes negligence, gross negligence or recklessness, the question is one of fact to be decided by a jury.").

The Court finds that reasonable persons may disagree as to whether the Officer Defendants exercised *any* care, and thus a question of fact exists to be tried by a jury. The parties are not entitled to summary judgment on gross negligence.

**5. IIED and NIED**

Defendants move for summary judgment on Plaintiffs' intentional infliction of emotional distress and negligent infliction of emotional distress claims.[7] To establish a cause of action for intentional infliction of emotional distress, claimants must show: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." Barmettler v. Reno Air, Inc., 114 Nev. 441, 447, 956 P.2d 1382, 1386 (Nev. 1998) (citation omitted). Whether conduct is outrageous is for the jury to evaluate based on community

[7] Defendants move for summary judgment on the claims to the extent that Plaintiffs' NIED claim is brought on behalf of J.E.D.

standards. See Posadas v. City of Reno, 851 P.2d 438, 444 (Nev. 1993). As explained above, causation in this case is a question for the jury. Additionally, construing facts in a light most favorable to Plaintiffs, the Court concludes that a jury could find that Defendants' conduct was extreme and outrageous. It follows that, because Plaintiffs have proffered sufficient evidence to create triable issues of fact on their IIED claim, they have also met the lower threshold for NIED claims. See Shoen v. Amerco, Inc., 111 Nev. 735, 749, 896 P.2d 469, 477 (Nev. 1995); Olivero v. Lowe, 116 Nev. 395, 401, 995 P.2d 1023, 1027 (Nev. 2000). Defendants are not entitled to summary judgment on IIED nor NIED.

**6. Wrongful Death**

Both parties have also moved for summary judgment on Plaintiffs' wrongful death claims. Under Nevada law, wrongful death claims are governed by Nev. Rev. Stat. § 41.085, which provides that "[w]hen the death of any person, whether or not a minor, is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death." Nev. Rev. Stat. § 41.085. For the same reasons the Court denied summary judgment on negligence and the 1983 Claims, the Court finds there to be a triable dispute over whether the Officer Defendants' conduct constituted a wrongful act or neglect sufficient to establish a wrongful death claim. Summary judgment is denied on this issue.

**7. Discretionary Function Immunity**

Both parties move for summary judgment on the discretionary function doctrine. Defendants argue they are entitled to summary judgment under the affirmative defense of discretionary function immunity. Under that doctrine, police officers, as employees of political subdivisions of the state, are shielded from liability "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty. . . whether or not the discretion involved is abused." Nev. Rev. Stat. § 41.032. However, "acts that violate the law are generally not the kinds of discretionary acts entitled to immunity." Tuuamalemalo v. Greene, 946 F.3d 471, 479 (9th Cir. 2019) (citing Nurse v. United States, 226 F.3d 996, 1002 (9th Cir. 2000)). A police officer's decision to arrest and detain is a discretionary act generally covered by § 41.032, but

discretionary-act immunity does not apply to bad-faith conduct. See Scafidi v. Las Vegas Metro. Police Dep't, 966 F.3d 960, 965 (9th Cir. 2020) (collecting cases).

Plaintiffs have submitted ample evidence creating a genuine dispute on the issue of the Officer Defendants' bad faith—particularly, deliberate indifference. See id.; *supra*, Part IV.A.2.iv. Plaintiffs have also put forth a triable negligence claim and alleged that Officer Defendants' decision not to detain Kenney was one of convenience, not of public policy. See Ptf. Resp. to Ofc. MSJ at 2; Martinez v. Maruszczak, 123 Nev. 433, 446, 168 P.3d 720, 728 (Nev. 2007) ("[C]ertain acts, although discretionary, do not fall within the discretionary-function exception's ambit because they involve negligence unrelated to any plausible policy objectives.") (citation omitted). Thus, the Court finds Defendants are not entitled to discretionary act immunity.

## V. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that the Plaintiffs' [145] Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** that the Officer Defendants' [146] Motion for Summary Judgment, and Nye County's [147] Motion for Summary Judgment are **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall submit a Joint Pretrial Order consistent with this Court's practices by **November 30, 2026**.

**DATED:** September 30, 2026.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**